179 F.3d 453
 Robert A. REED, et al., Plaintiffs-Appellants,
v.
James A. RHODES, et al.; Cleveland Board of Education; Ohio
State Board of Education; Ohio State Superintendent
(96-3603/3604); Cleveland City School District; Ohio
Department of Education (96-3604), Defendants-Appellees.
 Nos. 96-3603, 96-3604.
 United States Court of Appeals,
Sixth Circuit.
 Argued Nov. 3, 1998.
Decided June 10, 1999.
 
 Appeal from the United States District Court for the Northern District of Ohio at Cleveland. No. 73-01300--Robert B. Krupansky, Circuit Judge.
 ARGUED: James L. Hardiman, Hardiman, Buchanan, Howland & Trivers, Cleveland, Ohio, for Appellants. Margaret A. Cannon, Kelley, McCann & Livingstone, Cleveland, Ohio, Dale F. Kainski, Law Firm of Dale F. Kainski, Cleveland, Ohio, for Appellees. ON BRIEF: James L. Hardiman, Hardiman, Buchanan, Howland & Trivers, Cleveland, Ohio, Thomas I. Atkins, Brooklyn, New York, David W. Whitaker, Beachwood, Ohio, for Appellants. Margaret A. Cannon, Kelley, McCann & Livingstone, Cleveland, Ohio, Dale F. Kainski, Law Firm of Dale F. Kainski, Cleveland, Ohio, Wanda Rembert Arnold, Cleveland Board of Education, Cleveland, Ohio, Mark O'Neill, Weston Hurd Fallon Paisley & Howley, Cleveland, Ohio, Christopher M. Culley, James G. Tassie, Office of the Attorney General of Ohio, Columbus, Ohio, for Appellees. Charles E. Hannan, Jr., City of Cleveland Law Department, Office of Director of Law, Cleveland, Ohio, for Amicus Curiae.
 Before: MERRITT and COLE, Circuit Judges; EDMUNDS, District Judge.*
 MERRITT, J., delivered the opinion of the court, in which EDMUNDS, D. J., joined. COLE, J. (pp. ---- - ----), delivered a separate dissenting opinion.
 OPINION
 MERRITT, Circuit Judge.
 
 
 1
 The primary question in this school desegregation case is whether the Cleveland public school system, which has approximately 75,000 students, should be declared "unitary" so that the federal courts no longer control student assignments and no longer require the zoning and busing of students to achieve racial balance.
 
 
 2
 In 1973, Plaintiffs, who represent a certified class of all African-American students in the Cleveland public school system and their parents, successfully filed suit, alleging that Defendants had pursued policies, customs, and practices in the operation of the city public school system in a manner that had the purpose and effect of perpetuating a segregated system. The litigants before this Court have worked together and with the district court for 25 years to desegregate the Cleveland public school system. Their efforts have brought success. As early as 1988, Dr. Gordon Foster, plaintiffs' nationally known expert on school desegregation, pronounced Cleveland to be the only majority black, large city system in the country which is totally desegregated, adding that the school system had put an end to any overt segregation or discrimination. On May 8, 1996, after years of overseeing educational programs designed to guarantee a good education for all students in the Cleveland School District, regardless of race, the district court entered a termination order (1) modifying the central remedial Consent Decree that had guided the district's pupil assignment strategies so as to eliminate all further student assignment obligations, (2) declaring that the school district had achieved partial unitary status as to student assignments, and (3) vacating all student assignment remedial orders. See Reed v. Rhodes, 934 F.Supp. 1533 (N.D.Ohio 1996) (hereinafter "Termination Order" ).
 
 
 3
 These appeals present several issues for this Court. First, we must address whether the district court erred by modifying its earlier decrees so as to eliminate inconsistent, rigid mathematical student assignment prescriptions in favor of a so-called "Vision 21" plan developed by the parties in 1993, a plan based on parental choice favored overwhelmingly by the populace of Cleveland, including the African American community. Second, we must examine whether, in granting the Defendant's Motion for Partial Unitary Status, the district court correctly applied the proper legal standards necessary for this determination. Third, we must review for a possible abuse of discretion the decision of Senior Circuit Judge Robert B. Krupansky, who assumed the management of this litigation in November 1994, not to recuse himself pursuant to 28 U.S.C. § 455(a) in the face of allegations of impropriety stemming from certain ex parte communications. Finally, we must address whether the district court abused its discretion in holding that Plaintiffs' attorneys in the instant matter should be remunerated at hourly rates "not exceed[ing] the market rates necessary to encourage competent lawyers to undertake the representation in question." Coulter v. State of Tennessee, 805 F.2d 146 (6th Cir.1986).
 
 
 4
 For the following reasons, we affirm the judgments of the district court in all respects.
 
 I. BACKGROUND
 
 5
 A. Facts from 1975 to the Adoption of Vision 21 Plan in 1993
 
 
 6
 The history of this case is long and complicated. Two years after the suit was filed, the late Judge Frank J. Battisti presided over a lengthy bench trial in 1975 and 1976. On August 31, 1976, Judge Battisti dismissed the Complaint as to the Governor and the Attorney General, but concluded that the other Defendants, including the state board of education, had contributed, by both commission and omission, to an unconstitutional segregation of the Cleveland Public Schools. The court thus permanently enjoined Defendants "from discriminating on the basis of race in the operation of the public schools of the City of Cleveland, and from creating, promoting, or maintaining racial segregation in any school or other facility in the Cleveland Public Schools." Reed v. Rhodes, 422 F.Supp. 708, 797 (N.D.Ohio 1976), remanded without opinion, 559 F.2d 1220 (6th Cir.1977), on remand to 455 F.Supp. 546 (N.D.Ohio), on remand to 455 F.Supp. 569 (N.D.Ohio 1978).
 
 
 7
 On February 6, 1978, the district court reaffirmed its earlier conclusion that Defendants were constitutionally liable for having maintained a de jure segregated public school system, and that these numerous constitutional violations had system-wide impacts entitling plaintiffs to a system-wide remedy. The court also issued a remedial order directing Defendants to implement, beginning in September 1978, a "comprehensive, system-wide plan of actual desegregation which eliminates the systematic pattern of schools substantially disproportionate in their racial composition to the maximum extent feasible." Reed, 455 F.Supp. at 568. The court's broad remedial order required Defendants to desegregate administrative, supervisory and teaching personnel, to desegregate the schools, to develop creative educational curriculums, and to develop methods of monitoring compliance. The district court also ordered racial balance: "the racial composition of the student body of any school within the system shall not substantially deviate from the racial composition of the system as a whole." Id. at 608. The court then mandated that "[a] fifteen percent deviation from the percent ratio of the District as a whole is the maximum deviation that would be reasonable." Reed, 472 F.Supp. 615, 617 (N.D.Ohio 1979).
 
 
 8
 On August 11, 1980, the court appointed a Special Master (Mr. Daniel McCarthy), two experts on school desegregation (Dr. Gordon Foster of the University of Miami at Florida and Attorney Ted Mearns), and a certified accounting firm (Ernst & Ernst) to conduct a fiscal analysis of the school district en route to a comprehensive remedial order. In that Order, Judge Battisti directed the establishment of the Office of School Monitoring and Community Relations, charged it with rigorous monitoring of desegregation implementation, and ordered the appointment of an official Desegregation Administrator to be paid by defendants. These actions were affirmed by this Court. See Reed v. Rhodes, 635 F.2d 556 (6th Cir.1980).
 
 
 9
 Racial balance in Cleveland is difficult to achieve because the city is to a great extent divided racially along a North-South axis. Schools on the East Side are predominantly African-American; schools on the West Side are predominantly White. In order to comply with the plus/minus 15% test, the school system was first divided into 190 residential zones. Students were then assigned and bussed to schools across town to achieve the requisite racial balance in each individual school. When imbalances resurfaced, they were corrected by administrative orders and students were reassigned as needed. Annually, as many as 4,000 students were reassigned and bussed to satisfy the court order. Bus rides for some students exceeded 80 minutes each way, e.g. between the southeast corner of the school district, which has a student population that is 98-99% African American, and the southwest corner of the district, which is only 35% African American. Some schools, known as LAU sites, were excluded from the court's 15% parameters because they serve specially assigned concentrations of students who speak little English. Later, on August 14, 1987, Judge Battisti authorized changes in pupil assignments without prior court approval if such changes were agreeable to the following three parties: the school district, the State Superintendent, and Plaintiffs' legal counsel.
 
 
 10
 During the 1980s, the school system became predominantly nonwhite as a result of white flight. The Cleveland School District operated approximately 130 schools, 90% of which satisfied the 15% limitation every year. After the district court's order of August 14, 1987, Dr. Gordon Foster was appointed as a joint expert of all parties for the purpose of assisting in planning improvements to the student assignment process. Dr. Gordon had previously served as the Plaintiffs' expert witness during the liability phase of this case. In 1988, Dr. Gordon issued a report of his assessment of desegregation in the Cleveland School District. He stated that the district had put an end to any overt segregation or discrimination and was "the only majority black, large city system in the country which is totally desegregated." Termination Order, 934 F.Supp. 1533, 1538 (N.D.Ohio 1996) (quoting Foster Report, at i-ii) (emphasis added). In addition, pursuant to a July 10, 1990 court order, the Office of School Monitoring and Community Relations conducted a detailed assessment of the state of compliance with all outstanding remedial orders and concluded that Defendants had substantially complied with the 15% limitation and that any deviations therefrom could not be attributed to discriminatory student assignments. It reported:
 
 
 11
 Based on presently available information, it appears that defendants have complied in large part with the requirement that all schools have enrollments by race that reflect district-wide enrollment by race. While a relatively small proportion of district schools each year have enrollments that exceed the maximum deviation that would be reasonable (plus or minus 15% from the district ratio), no evidence suggests that this is the result of discrimination on the basis of race in the assignment of students.
 
 
 12
 Id. at 1542 (citing Office of School Monitoring and Community Relations Report, at V-1-11) (emphasis added). The Office's assessment recommended that the parties continue to work together to move the case forward.
 
 
 13
 In March 1992, the district court vacated over 500 orders upon joint motion of all the parties. There was a sense that the quality of public education had declined while the cost of operation had increased. The court thus urged the parties "not to hesitate to think about innovative programs and undertakings" that might ameliorate the situation in the school system. Reed v. Rhodes, 1992 WL 80626, at * 2 (N.D.Ohio Apr.2, 1992). Judge Battisti further noted that "the Court [had] not set out to run a busing company," id. at * 1; directed the parties to address whether they believed "the interests of the students in Cleveland would be better served by an alternative student assignment plan," id. at * 4; and suggested that parental and student choice become an important factor in student assignment within the Cleveland School District, see id.
 
 B. Development of Vision 21 Plan
 
 14
 With these goals in mind, the school district retained Dr. Foster and Dr. Joseph Darden, Dean of the Urban Affairs School at Michigan State University, to advise it on ways for improving student assignments. Based on the recommendations of these experts, the district court approved the school district's proposal to exempt from mandatory school assignment and the 15% parameters six elementary schools in which surrounding neighborhoods were racially integrated and further recommended that families in those areas be given the choice to have their children attend their community elementary school. This program, known as "Phase One," was a success. Numerous students who had left the school district to attend private schools returned to their community schools and each school met the 15% limitation despite their exemption therefrom.
 
 
 15
 Soon thereafter, the school district developed a more comprehensive program knows as Vision 21 based on the idea that parents and students should have even greater choice in schools. Vision 21 had three main components: (1) strengthening the Cleveland schools' basic curriculum; (2) developing programs designed specifically to ensure African-American students opportunities for a quality education as measured by improved student outcomes over time; and (3) implementing parental choice, which called for a dramatic expansion of the magnet school program and introduction of community model schools. Under the third component, parents were offered multiple (usually three) school choices. For example, parents of an elementary school child could choose from either a district-wide magnet school or a community model school in their region. If a desegregated school was unavailable in their region, the program allowed the parents the option of choosing an integrated school outside the region.
 
 
 16
 Vision 21's parental choice program was designed to be phased in over four years. Dr. Foster and Dr. Darden noted that particular attention had to be paid to the three corners of the triangular school district, where schools persistently fell outside the 15% limits due to changing demographics and the long distances students were forced to travel. The school district thus proposed that the three corners no longer be paired with any other region but instead remain as autonomous regions not subject to the school district's 15% limitation. The district court approved Vision 21 on July 21, 1993, although it was clear that greater parental choice would result in a number of additional schools exceeding the district's 15% parameters. During the 1993-94 school year, the first year of Vision 21's implementation, 41 schools fell outside the 15% limitation. This was the result of treating the three corner regions as autonomous areas, altering the grade structure of schools in those corners (changing to K-5, 6-8, and 9-12), providing new choice options to community elementary schools in those regions, and suspending the annual assignment adjustments.
 
 
 17
 C. The 1994 Consent Decree Based on Vision 21
 
 
 18
 In 1992, Judge Battisti had encouraged settlement discussions among the parties. On October 19, 1993, the court directed the parties, under the leadership of Daniel McMullen, Director of the Office of School Monitoring and Community Relations, to begin discussing the future of Vision 21, its funding, and a settlement of all outstanding issues in the case. The parties were to present the court with a settlement agreement by February 1, 1994. All parties obeyed this order and on March 15, 1994, signed a comprehensive settlement agreement that was approved as a Consent Decree on May 25, 1994. See Reed v. Rhodes, 869 F.Supp. 1265 (N.D.Ohio 1994).
 
 
 19
 The Consent Decree was ambitious in scope. It provided:
 
 
 20
 The purpose of this Agreement is to bring Reed v. Rhodes to a just resolution, consistent with the remedial orders, by eliminating, to the extent practicable, those conditions that the Plaintiff and the District believe are vestiges of past unlawful segregation in the District; to reconcile all outstanding differences between the Parties; to support the reformation of educational processes in the Cleveland School District; to assure that education will continue in desegregated settings; to provide sufficient funding consistent with local voters' support for the educational initiatives known as Vision 21; to provide for monitoring of implementation, the identification of problems, and the resolution of potential disputes about compliance with either remedial orders or the provisions of this Agreement; and to authorize the State Superintendent of Public Instruction and the Court to assure compliance with the undertakings hereinafter defined.
 
 
 21
 Reed v. Rhodes, 869 F.Supp. 1265, 1268 (N.D.Ohio 1994) (Settlement Agreement, § 3). The Consent Decree, inter alia: (1) officially establishes the 15% parameter by which the racial composition of each school is judged, see Settlement Agreement § 5.1; (2) specifies permissible exceptions to that guideline for the school years 1994-95 and 1995-96; see id. §§ 6.1, 6.2; (3) provides that in the 1996-97 school year and thereafter until July 1, 2000, "all schools shall comply with the requirements of Section 5.1," see id. § 6.2; (4) establishes state financial support for the desegregation-related and remedial-order related components of Vision 21 until the year 2000, see id. § 7; (5) mandates that the school district adopt a strategic plan for permanent facilities improvement, see id. § 8.3; (6) defines the procedures for modifying remedial orders, see id. § 10; (7) forbids the Defendants, in their operation of the school district, from segregating or discriminating against students based on race, see id. § 11.1; (8) establishes that individual schools shall be subject to appropriate intervention, as defined in § 11.3, if the scores of their students are in the bottom quartile of recognized proficiency tests or if they exhibit substantial disparities by race in student expulsions or suspensions, see id. § 11.2; and (9) provides that at least annually, all Parties shall meet to assess the status of Consent Decree implementation and compliance with relevant remedial orders, see id. § 13. Finally, Section 15 provides that (1) on or after July 1, 1997, the Parties shall request that the district court schedule a public hearing to assess the compliance with the relevant remedial orders and terms of the Agreement, and (2) the Court may at that time release the Defendants from all further obligations, except for those defined by the Consent Decree for the period from July 1, 1997 to July 1, 2000 if the court finds that (a) the Defendants have implemented all provisions of the Consent Decree and complied with all extant remedial orders to the extent practicable; and (b) all vestiges of past discrimination and segregation have been eliminated to the extent practicable; and (c) the Defendants have otherwise demonstrated good faith commitment to their constitutional obligations. See Reed v. Rhodes, 869 F.Supp. 1265, 1268-73 (N.D.Ohio 1994).
 
 
 22
 Judge Battisti passed away on October 19, 1994, six months after the entry of the Consent Decree. Supervision of his docket was assumed by Senior Circuit Judge Robert B. Krupansky on November 1, 1994. That autumn, Vision 21 was implemented in the three corners of the School District where schools were exempt from the District's mandatory 15% parameter. Outside those zones, 25 non-exempt schools were outside the 15% limit. The school district thus recruited students who would be willing to transfer. As a result, five additional schools fell within the 15% range. Negotiations during November and December 1994 produced an agreement that nine of the twenty remaining non-compliant schools should be brought into compliance through the mandatory reassignment of approximately 400 students by the end of January 1995. On January 5, 1995, the school district moved for (1) a temporary stay of the reassignment of those 400 students, (2) a Declaration of Partial Unitary Status as to student assignments, and (3) modification of the Consent Decree, which motion was opposed by both Plaintiffs and the State on the grounds that there had been no significant change in circumstances since the Consent Decree was signed eight months earlier which would warrant a modification of the Decree.
 
 
 23
 On January 9, 1995, the district court dismissed Local Defendants' Motion for a Temporary Stay on the reassignment of the 400 students, but also refused to order any interim changes in assignments. On February 24, 1995, the court announced the reappointment of Daniel J. McMullen, the former Director of the Office of School Monitoring and Community Relations, as Special Master for the purpose of exploring with the parties alternative proposals to the use of mathematical ratios as a predicate for student assignments. At a hearing on that same day, the court heard numerous oral testimonies on the financial and managerial condition of the school district which indicated that the District was in dire financial straits. On March 3, 1995, the court announced that it was displacing the Cleveland Board of Education and ordered the State Superintendent to assume direction and control over all aspects of the school district's operations.
 
 
 24
 D. The Modification of the 1994 Consent Decree
 
 
 25
 In March and April 1995, Special Master McMullen supervised discussions between the parties in connection with Defendants' Motion for Partial Unitary Status. The discussions explored whether an agreement could be reached on criteria for student assignments that would be more flexible than the 15% limitation defined in the Consent Decree. When the parties were unable to reach an agreement, McMullen conducted a two-day hearing during which the State proposed a ten-point program for pupil assignments to begin in September 1995. Further negotiations resulted in an agreement to modify the May 1994 Consent Decree regarding student assignments for the 1995-96 school year and to try the state plan on an experimental basis for one year. The agreement was reduced to a stipulation that was presented to and approved by the court on May 16, 1995.
 
 
 26
 Under the terms of the Joint Stipulation, (1) the school district's Motion for Declaration of Partial Unitary Status as to student assignments was withdrawn without prejudice; (2) no party would challenge the State's plan as a violation of the Consent Decree; (3) student assignments for the 1995-96 school year would be made in accordance with the state plan; (4) any increase in the number of schools exceeding the school district's 15% parameters during 1995-96 would not be deemed a violation of the Consent Decree; (5) the parties were required to present to the court, no later than December 31, 1995, an agreement concerning student assignments to last for the remainder of the term of the Consent Decree; and (6) if the parties failed to reach an agreement, any party could move the court by January 31, 1996, or the court could convene hearings sua sponte, to consider student assignments for the 1996-97 school year and thereafter. The Joint Stipulation expressly provided that it modified the Consent Decree for the 1995-96 school year.
 
 
 27
 The State's ten-point plan suspended the 15% parameter for one year and gave increased choice to students and their parents. All schools were to be at least one-third African-American, and could have more than 90% African-American students if that was the result of parental choice. The Plan also provided for more magnet schools and opportunities to attend community model schools. In the event that students were not pleased with their school assignment, they would be allowed to attend a school which more nearly reflected the district's racial composition if they so desired.
 
 
 28
 Assignments for the 1995-96 school year were made in accordance with the stipulated state plan. In November 1995, the school district's Superintendent reported the results of the new system. All students were offered a guaranteed assignment to a school which was within the 15% parameter; no school opened with fewer than one-third African American students; as a result of school choice by parents and students, 27 schools had student populations that were 90% or more African-American; 19 of 20 magnet schools satisfied the 15% limitation, with one magnet school only 0.5% off; and 58 schools in the district still satisfied the 15% limitation. Approximately 50,000 students accepted one of their guaranteed assignments. By contrast, 22,000 students exercised their right to choose an optional assignment.
 
 
 29
 The Superintendent reported a very high degree of parental satisfaction with the Plan but warned that it would be difficult or inequitable to implement in future years. First, the exercise of choice would reduce the number of schools which would fall within the 15% limits, thereby making it more difficult to guarantee all children an assignment to one of those schools. In fact, this had only been possible during the 1995-96 school year because 3,600 students were available for reassignment following the closing of eleven schools. Second, it would be inequitable to insure that all schools would be at least one-third African-American, as about 600-700 students from pockets on both sides of the city would have to bear the disproportionate burden of being reassigned to satisfy that requirement, while other students in the district would still be afforded controlled choice options. Third, maintaining the 15% limitation on magnet schools would require eliminating some students because their racial group was oversubscribed.
 
 
 30
 The Joint Stipulation of May 6, 1995 obligated the parties to report to the court by December 31, 1995 with a settlement agreement on student assignments. The parties' efforts proved futile. The State and the school district were unwilling to agree to maintain the 15% parameter, as this would have required reassigning and bussing over 9,000 students, thereby undoing the choices families had made in accordance with their options under the Joint Stipulation. Plaintiffs, on the other hand, were unwilling to consider anything else. Consequently, on January 3, 1996, State Defendants exercised their prerogative under the Joint Stipulation and moved, on behalf of themselves and the school district, for both an Order to Modify the Consent Decree so as to eliminate the 15% parameters and a Declaration of Unitary Status on the student assignment component of the remedial orders. Under the State's proposed modification of the Consent Decree, the 15% requirement and all other arithmetic quotas would be abolished in favor of parental choice. The goal for magnet schools would be 70% African-American, but no student would be excluded because of racial limitations. Finally, the right to transfer to a more integrated setting would be preserved, as would the right to attend a neighborhood school close to home, if that were the product of parental choice.
 
 
 31
 On February 1, 1996, Judge Krupansky conducted a bench trial during which the court heard the testimony of numerous state and district officials, a demographics expert, Special Master McMullen, and several expert witnesses. The school district's Senior Executive Manager for Desegregation Compliance, the State Superintendent, and the Assistant State Superintendent for the Cleveland Public Schools all testified that the Consent Decree should be modified as requested in light of the fact that there were no remaining vestiges of the segregative assignment practices identified in the liability findings of Judge Battisti on August 31, 1976. On May 8, 1996, Judge Krupansky entered an Order modifying the Consent Decree to eliminate all further student assignment obligations, declaring that the Defendants had achieved partial unitary status as to student assignments, and vacating all student assignment remedial orders. See Termination Order, 934 F.Supp. at 1558. Plaintiffs appealed on May 13, 1996.
 
 
 32
 II. VALIDITY OF THE DISTRICT COURT'S MODIFICATION OF THE
 
 CONSENT DECREE
 
 33
 In Board of Education of Oklahoma City Public Schools Independent School District No. 89 v. Dowell, 498 U.S. 237, 111 S.Ct. 630, 112 L.Ed.2d 715 (1991), Petitioner, the Board of Education of Oklahoma City, sought dissolution of a decree entered by the district court imposing a school desegregation plan. The district court granted relief over the objection of the Respondents, African-American students and their parents. The Tenth Circuit reversed, relying on the "grievous wrong" standard enunciated by the Supreme Court in United States v. Swift & Co., 286 U.S. 106, 119, 52 S.Ct. 460, 76 L.Ed. 999 (1932) ("Nothing less than a clear showing of grievous wrong evoked by new and unforeseen conditions should lead us to change what was decreed after years of litigation with the consent of all concerned."). See Dowell v. Board of Educ. of Okla. City Pub. Schs., Indep. Sch. Dist. No. 89, 890 F.2d 1483, 1490 (10th Cir.1989) (quoting Swift, 286 U.S. at 19), rev'd, 498 U.S. 237, 111 S.Ct. 630, 112 L.Ed.2d 715 (1991). The Supreme Court reversed, however, establishing that the Swift standard does not govern school desegregation cases. The Court reasoned:
 
 
 34
 Considerations based on the allocation of powers within our federal system, we think, support our view that ... Swift does not provide the proper standard to apply to injunctions entered in school desegregation cases. Such decrees, like the one in Swift, are not intended to operate in perpetuity. Local control over the education of children allows citizens to participate in decisionmaking, and allows innovation so that school programs can fit local needs.... The legal justification for displacement of local authority by an injunctive decree in a school desegregation case is a violation of the Constitution by the local authorities. Dissolving a desegregation decree after the local authorities have operated in compliance with it for a reasonable period of time properly recognizes that necessary concern for the important values of local control of public school systems dictates that a federal court's regulatory control of such systems not extend beyond the time required to remedy the effects of past intentional discrimination.
 
 
 35
 498 U.S. at 248.
 
 
 36
 In the instant matter, the late Judge Battisti in 1979 ordered that all schools in the Cleveland School District fall within the 15% deviation from racial ratios of the district as a whole. See Reed, 472 F.Supp. 615, 617 (N.D.Ohio 1979). By 1983, only ten schools were outside the 15% parameter, and every school had a racial ratio within 22% of the district-wide average. Two years later, in 1985, the district court approved a "Five-Year Facilities Utilization Plan" developed by Defendants to ensure that the School District remained in compliance with the 15% limitation. The Plan directed annual compliance reviews to monitor and analyze the desegregated status of individual schools, and to plan student reassignments or other measures as necessary to maintain racial balances within acceptable ranges. These reviews and readjustments resulted in extremely high levels of compliance in excess of 90% throughout the 1980s and into the early 1990s. This astonishing success no doubt served at least as part of the basis for Dr. Gordon Foster's conclusion in 1988 that Cleveland was "the only majority Black, large city system in the country which is totally desegregated." In addressing the small percentage of noncompliant schools, the Court's Office on School Monitoring and Community Relations concluded that "no evidence suggests that this is the result of discrimination on the basis of race in the assignment of students."
 
 
 37
 As a result of the early successes of both the Plan and Phase One's parental choice initiative and model community schools, the district court implemented Vision 21, which greatly expanded the role of parental choice in student assignments. The parties' 1994 settlement agreement and the district court's Order of May 25, 1994 both acknowledge the importance of Vision 21 as the linchpin of the parties' agreement. Termination Order, 934 F.Supp. 1533, 1543 (N.D.Ohio 1996) ("Vision 21 was approved and adopted in its entirety without modifications or amendments and became the bedrock foundation of the negotiated court-appointed Settlement Agreement.") (emphasis added).
 
 
 38
 From the start, both parties agreed that: (1) Vision 21 was to be implemented in such a manner as to comply with the court's desegregation order; (2) Vision 21 was designed to increase substantially the opportunity for all students in the District to receive a high-quality education in a desegregated environment; and (3) Vision 21 was the first step toward "the gradual implementation of a controlled-choice student assignment plan." Id. (citing parties' Joint Findings of Fact and Conclusions of Law). Pursuant to an agreement between the parties approved by the court, a partial implementation of Vision 21 was commenced in the 1993-94 school year, during which 41 schools exceeded the 15% remedial mandate. This came as no surprise. As the district court noted, both the parties and the Court understood that Vision 21 would result in greater short-term noncompliance with the 15% limitation and a reemergence of schools with 90% or more African-American enrollment. See id. "It was, however, contemplated that the two student-school assignment policies were nevertheless compatible and that available attractive alternative parental enrollment inducements would result in parental elections that would, within the two-year period imposed by section 6.3 of the Consent Decree, return all school-student enrollments to within relative +-15% compliance with the Remedial Order." Id. These hopes were not founded upon mere speculation; rather, the School District took numerous affirmative steps to implement an aggressive restructuring program in order to harmonize the 15% parameter with Vision 21's broadly expanded parental student school enrollment choice. The Defendants provided for an increase in the number of magnet schools; they created community model schools, such as Afro-Centric/Multicultural Immersion Schools; they created guaranteed residential zones around the newly-created community model schools; they reassigned students, overriding parental choice in some instances in order to effect a more favorable distribution in certain schools; they afforded transfer priorities to students in overcrowded middle schools; they advertised magnet schools to attract underrepresented races; and they modified residential feeder patterns to improve racial balance at particular schools throughout the district.
 
 
 39
 Despite the school district's considerable efforts, parental choice served as a powerful foil to continued compliance with the 15% parameter during the 1990s. Following an open hearing on April 19-20, 1995, Special Master Daniel McMullen issued a report that reflected prevailing community standards within the Cleveland School District. The report disclosed that an overwhelming majority (86%) of African-American parents considered their right to choose to send their children to neighborhood schools more important than busing for racial balance within the district as a whole, so long as such choice did not result in an inferior quality of education for their children. The Defendants soon realized that their initial hope of reconciling the 15% parameter with Vision 21 was unfounded and that the School District would be unable to satisfy the student assignment requirements of the Consent Decree. As the district court stated:
 
 
 40
 [T]he record confirms that despite the initial optimism of the Court and the parties to harmonize the +-15% component in the Consent Decree with the implementation of the criteria of Vision 21 also incorporated into the Consent Decree, it became obvious that the intractable mathematical ratio of +-15% reflected in sections 5 and 6 was, and is, in conflict with the innovative community-supported initiatives of Vision 21. Experience dictates that the conflicting philosophies have become irreconcilable. Two years of implementing the student assignment provisions of Vision 21 have confirmed that the +-15% standard incorporated into sections 5 and 6 of the Consent Decree is outdated and cannot be balanced with the innovative concepts of Vision 21 of that Decree.
 
 
 41
 Termination Order, 934 F.Supp. at 1544.
 
 
 42
 Under Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992), a consent decree may properly be modified, inter alia, "when enforcement of the decree without modification would be detrimental to the public interest." 502 U.S. at 384. When Vision 21 and its prescriptions for parental choice were first introduced, it was widely acclaimed by both sides as a progressive, innovative educational program designed to comply with Judge Battisti's order to develop both creative educational curricula in reading and other programs designed to correct the effects of prior segregated schooling. In fact, Vision 21 was so universally accepted by the people of Cleveland that the parties to this litigation incorporated it, without modification, as a centerpiece of the Consent Decree of May 25, 1994.
 
 
 43
 We wish it were possible to reconcile the inherent conflict between the mandate of the 15% student assignment limitation imposed by Judge Battisti's 1978 Remedial Order, as incorporated into sections 5 and 6 of the Consent Decree of May 25, 1994, and Vision 21's school choice provisions. Experience clearly indicates, however, that the two approaches are inherently irreconcilable. The district court found that "[t]his realization represents a material factual change and unforeseen circumstance which compels the Court to conclude that 'enforcement of the decrees without the proposed modification would be detrimental to the public interest.' " Termination Order, 934 F.Supp. at 1545 (quoting Rufo, 502 U.S. at 384-85). We agree.
 
 
 44
 The Supreme Court has made clear that "[o]nce a court has determined that changed circumstances warrant a modification of a consent decree, the focus should be on whether the proposed modification is tailored to resolve the problem created by the change in circumstances. A court should do no more, for a consent decree is a final judgment that may be reopened only to the extent that equity requires." Rufo, 502 U.S. at 391-92. In the instant matter, Defendants have not sought to rewrite the agreement in toto. On the contrary, they seek only to modify sections 5 and 6 of the Consent Decree, which establish officially the inflexible 15% parameter by which the racial composition of each school is measured. As the district court emphasized, "the remainder of the Consent Decree remains intact and its terms, conditions, responsibilities, and liabilities continue to bind the parties and are calculated to survive beyond the Court's supervision and control of the Cleveland School District." Termination Order, 934 F.Supp. at 1546. We therefore agree that the district court's modification of the Consent Decree was "suitably tailored," Rufo, 502 U.S. at 391, to the changed circumstances. Because this Court does not find that the district court erred in its determinations either that "enforcement of the decree without modification would be detrimental to the public interest," id. at 384, or that the proposed modifications were suitably tailored to the changed circumstances, it cannot be said that the lower court abused its discretion in modifying the decree.
 
 
 45
 III. THE UNITARY STATUS OF THE CLEVELAND PUBLIC SCHOOL SYSTEM
 
 
 46
 In its Order of May 8, 1996, the district court in the instant matter ordered that Defendants are entitled to a declaration of unitary status with respect to pupil assignments and that the Court's jurisdiction over pupil assignments was dissolved so as to permit the school authorities henceforth to assign pupils in accordance with their best judgment. We are satisfied that the district court did not err in its application of the controlling law in this regard. See Missouri v. Jenkins, 515 U.S. 70, 115 S.Ct. 2038, 132 L.Ed.2d 63 (1995); Freeman v. Pitts, 503 U.S. 467, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992); Board of Educ. of Oklahoma City v. Dowell, 498 U.S. 237, 111 S.Ct. 630, 112 L.Ed.2d 715 (1991); Milliken v. Bradley, 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977) (Milliken II ); Pasadena City Bd. of Educ. v. Spangler, 427 U.S. 424, 96 S.Ct. 2697, 49 L.Ed.2d 599 (1976); Milliken v. Bradley, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974) (Milliken I ); Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). In so ruling, we rely upon the reasons set forth by the district court in the thorough analysis of its Order of May 8, 1996. See Termination Order, 934 F.Supp. at 1546-58.
 
 
 47
 We find convincing the district court's analysis of Freeman, where the Supreme Court found that the school system in DeKalb County, Georgia, had fully and satisfactorily complied with the student assignment component of the remedial decree in that case. Having examined both the efforts of the DeKalb County school system and the demographic changes that had occurred within the 17-year life span of the remedial consent decree, the Supreme Court affirmed the conclusion of the trial court in that case that massive bussing was not a viable option and further enunciated an important principle for school desegregation cases across the nation:
 
 
 48
 That there was racial imbalance in student attendance zones was not tantamount to a showing that the school district was in noncompliance with the decree or with its duties under the law. Racial balance is not to be achieved for its own sake. It is to be pursued when racial imbalance has been caused by a constitutional violation. Once the racial imbalance due to the de jure violation has been remedied, the school district is under no duty to remedy imbalance that is caused by demographic factors. Freeman, 503 U.S. at 494. See also id. at 512 (Blackmun, J., concurring) (A school system's obligation to desegregate "does not always require the district court to order new, affirmative action simply because of racial imbalance in student assignments.").
 
 
 49
 The statistical analysis found in the district court's termination order indicated that the imbalance of schools not in compliance with the remedial consent decree in Freeman far exceeded the number of Cleveland schools that were outside the 15% parameter mandated by Judge Battisti's remedial Order and Consent Decree in the instant matter. Indeed, a direct comparison of the DeKalb County School System in Freeman and the Cleveland School District from 1983 to 1991 indicates that the latter achieved substantially greater student desegregation than the DeKalb County School System, as measured by all the following factors: (1) the percentage of African-American students each year who attended schools which were more than 90% African American; (2) the percentage of African-American students each year who attended schools that had greater than 20% more African Americans than the system-wide average; (3) the percentage of White students who attended schools which were more than 90% White; (4) the percentage of White students who attended a school with greater than 20% more Whites than the system-wide average; and (5) the number of schools each year that had even greater than 90% African-American or 90% White student populations. Moreover, we wish to emphasize that the figures for Cleveland reflected much greater desegregation than that in DeKalb County even after the implementation of the student assignment practices of the Joint Stipulation of May 15, 1995, which relied almost exclusively on the parental choice initiatives of Vision 21 in lieu of the Cleveland School District's outdated 15% mathematical parameters. As the district court noted:
 
 
 50
 The Defendants' record of compliance with this Court's various Remedial Orders stands as an unequivocal manifestation of their good faith efforts to desegregate the Cleveland School District. Defendants have created an innovative school system that has implemented a number of initiatives designed to develop self-esteem and enhance the academic potential of all students regardless of race. Many remedial programs are targeted in African-American schools. Programs have been implemented to involve parents and offset negative socioeconomic factors. If the Cleveland School District has failed in any way, it is not because the school system has been negligent in its duties. The record discloses that the City of Cleveland has historically been a residentially segregated bi-polar community (African-American east of the Cuyahoga River and Caucasian west of the Cuyahoga River). The demographics of recent years have reflected rapid population shifts within the city that were not caused by or attributable to the Cleveland School District. These demographic dynamics were inevitable as a result of suburbanization and socioeconomic conditions. No evidence has been developed in these proceedings to support a conclusion that the effect of the Cleveland School District's previous unconstitutional conduct may have contributed to the residential segregation of the community and/or the dynamics of population mobility.
 
 
 51
 Termination Order, 934 F.Supp. at 1552.
 
 
 52
 We thus affirm the district court's order that Defendants are entitled to a declaration of unitary status with respect to student assignment and that the court's jurisdiction over pupil assignment is dissolved. In light of the district court's exhaustive analysis of these issues, we feel that any further analysis by this Court would be duplicative and would serve no jurisprudential purpose.
 
 IV. JUDGE KRUPANSKY'S MANAGEMENT OF THE CASE
 
 53
 28 U.S.C. § 455(a) provides: "Any justice, judge or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." On January 11, 1996, Plaintiffs filed a Motion to Recuse Judge Krupansky, arguing that ex parte communications between the judge and various parties involved in the litigation required him to recuse himself from the instant matter. We address now the question whether Judge Krupansky abused his discretion in denying that motion.[1] See Order of Feb. 1, 1996.
 
 
 54
 In their Motion to Recuse Judge Krupansky, Plaintiffs complain that the judge created the appearance of partiality by meeting ex parte with a number of different parties, including: (1) state officials such as the Defendant State Superintendents of Public Instruction, various staff members of the Department of Education, and the State Defendants' lawyers; (2) Local Defendants, including Defendant Cleveland Superintendent of Schools; and (3) private citizens, including the General Counsel of the Cleveland School District, the Cleveland Teachers' Union President, and employees of the consulting firm McKinsey & Co., whose services had been obtained by the State. These communications are alleged to have covered a variety of topics, including, inter alia: (1) the general management, fiscal status, and future governance of the School District; (2) anticipated student assignment negotiations between State Defendants and Plaintiffs; and (3) the potential for a declaration of unitary status for the school system.
 
 
 55
 When confronted with a Motion to Recuse under 28 U.S.C. § 455(a), a district judge must apply an objective standard of inquiry: Would a reasonable person knowing all the relevant facts question the impartiality of the judge? See Roberts v. Bailar, 625 F.2d 125, 129 (6th Cir.1980). Our review of the full record in this case compels our conclusion that a reasonable person with such knowledge would not doubt Judge Krupansky's partiality.
 
 
 56
 During the course of Judge Krupansky's management of this litigation the Cleveland School District suffered "total fiscal and administrative collapse." Termination Order, 934 F.Supp. at 1539. Accordingly, on March 3, 1995, the district court ordered the Ohio State Board of Education and its Superintendent of Instruction to assume complete administration and operational control of the District pursuant to its delegated state constitutional and statutory authority and restore the System's integrity, operational control, and capability to resume implementation of this Court's orders without interference from the local Board of Education. Shortly thereafter, Dr. Ted Sanders, the then State of Ohio Superintendent of Public Instruction, developed and then began the implementation of a viable contingency plan designed to restore the fiscal and operational administrative capability necessary to alleviate the School District's imminent crisis. Dr. Sanders, with the help of both his assistants Dr. John Goff and Dr. Richard Boyd and McKinsey & Co., stabilized the financial and management integrity of the School District and developed an interim and long-range plan to review the financial and management capabilities of the District.
 
 
 57
 While the school system remained in state receivership, the district court was necessarily involved in the oversight of the State's work. In this capacity, the court necessarily had to communicate with Dr. Sanders, Dr. Goff, and others, as Judge Krupansky made clear in his Order of February 1, 1996. Much of this communication occurred ex parte. Plaintiffs argue that they "had no means to address, respond to, or counter, the adverse, inaccurate, incomplete assertions or assumptions in the secret record generated by Judge Krupansky." Plaintiffs' Br. 43. However, as the Defendants note, Judge Krupansky personally explained to Plaintiffs' counsel the ministerial nature of these ex parte discussions before they took place. Moreover, it is undisputed that Judge Krupansky personally extended to Plaintiffs' counsel an invitation to attend all of these meetings. Plaintiffs' counsel consistently refused this invitation over an eight-month period during which many of these meetings took place and failed to register any objection to the meetings at that time despite the fact that they knew ex ante that these conferences had already been scheduled. Finally, Judge Krupansky's communications with the State Superintendent, the Superintendent of Schools in Cleveland, the Auditor of the State, with representatives of McKinsey & Co., and with counsel for the state and local defendants were related exclusively to the judicial oversight of the reorganization which the court had mandated in its Order of March 3, 1995. None of these matters involved any issue which was then or later in dispute with the plaintiffs.
 
 
 58
 Under 28 U.S.C. § 455(a), disqualifications "must be predicated upon extrajudicial conduct rather than on judicial conduct; and upon a personal bias as distinguished from [a] judicial one, arising out of the judge's background and association and not from the judge's view of the law." Green v. Nevers, 111 F.3d 1295, 1303-04 (6th Cir.1997) (internal quotations and citations omitted). This Court has had numerous occasions to consider a district judge's decision not to recuse himself in the face of a § 455(a) motion. Two of these cases arose in the context of institutional reform litigation. See In re City of Detroit, 828 F.2d 160, 1167 (6th Cir.1987); Bradley v. Milliken, 620 F.2d 1143 (6th Cir.1980). In Milliken, the district judge was involved in a complex school desegregation case in Detroit. During the later phases of the litigation, plaintiffs' counsel Mr. Thomas Atkins--the same attorney who represents Plaintiffs in the instant matter--complained that District Judge DeMascio had created an appearance of partiality by meeting ex parte with the Detroit Board's representative even before the plaintiffs' counsel had received a copy of the court's filed remedial guidelines in that case. The plaintiffs also alleged that they had been excluded from "negotiations" with the Board which shaped the ultimate desegregation plan. Judge DeMascio denied the plaintiffs' Motion to Recuse him under 28 U.S.C. § 455(a), stating that the incidents in question were judicial activities designed to ensure a community climate receptive to the court's orders. On appeal, the Sixth Circuit agreed that Judge DeMascio had acted well within his discretion. See id. at 1157. This Court stated: "Judge DeMascio's actions appear to us to have been judicial activities. To make out a case for recusal under § 455(a), a movant must rely on extra-judicial conduct rather than matters arising in a judicial context." Id.
 
 
 59
 Likewise, we find that Judge Krupansky's communications with the aforementioned parties, though ex parte, concerned matters arising in a purely judicial context. All of the communications about which Plaintiffs complain arose out of the court's oversight of the people who were responsible for the implementation of Judge Krupansky's Order of March 3, 1995, which required considerable action by the State. Those communications were ministerial in nature and did not pertain to matters at issue between the parties as adversaries. Such minimum contacts were necessary for the court to maintain effective contact with those parties Judge Krupansky had appointed to assume control of the Cleveland School District. Accordingly, we find that Judge Krupansky's Order of February 1, 1996 denying Plaintiff's Motion to Recuse him under 28 U.S.C. § 455(a) was not an abuse of his discretion.
 
 V. REASONABLE ATTORNEYS' FEES
 
 60
 Finally, we must address the question whether the district court abused its discretion in holding that Plaintiffs' attorneys in the instant matter should be remunerated at hourly rates "not exceed[ing] the market rates necessary to encourage competent lawyers to undertake the representation in question." Coulter v. State of Tennessee, 805 F.2d 146 (6th Cir.1986).[2] We find that it did not.
 
 
 61
 In the instant matter, Plaintiffs have been represented by three attorneys: Mr. James Hardiman and Mr. Thomas Atkins, who have been involved in the litigation since suit was filed in 1973 and participated in the liability trial, as well as the creation, implementation and monitoring of the suit's various remedial orders, including the parties' Consent Decree; and Mr. David Whitaker, who joined the team of Plaintiffs' counsel to assist in the negotiation, monitoring and implementation of the numerous remedial orders and the Consent Decree.
 
 
 62
 On September 13, 1995, Plaintiffs' counsel submitted to Judge Krupansky their respective applications for attorneys fees as the prevailing party on behalf of the class from 1992 to 1995, including the costs of Plaintiffs' expert witness Dr. Robert Green. The total amount sought was $528,552.53. Mr. Atkins, a lawyer from New York City, sought compensation for legal services rendered between July 6, 1994 and August 4, 1995 at a rate of $340 per hour charged in increments of 30 minutes, for a total of $126,401.04, plus additional expenses for the retention of Dr. Green at $75 per hour for a total of $36,057.50. Mr. Hardiman, the senior partner in his Cleveland law firm, sought various levels of compensation ranging between $175 and $225 per hour for the period from January 7, 1993 through August 31, 1995, plus out-of-pocket expenses for a total of $263,786.00. Finally, Mr. Whitaker sought fees for services rendered from May 1990 through September 1, 1995, at the hourly rate of $160 per hour, plus out-of-pocket expenses for a total of $102,734.99.
 
 
 63
 On October 25, 1995, Plaintiffs' counsel also filed a Motion for an Interim Award of Fees and Costs for services dating back to March 1992, asserting an urgent need for 50% of the requested fees. While Judge Krupansky gave these applications his full attention, he did not consider them by himself. Rather, he also prudently referred them to a specially appointed Legal Advisory Commission on Attorneys Fees for an independent review. The Commission was composed of four lawyers from the Northern District of Ohio who agreed to serve in a pro bono capacity. Thus, both the district court and the Commission conducted independent and impartial reviews of these applications.
 
 
 64
 In its Report of November 1, 1995 to Judge Krupansky, the Commission concluded that the fee applications did not conform to generally accepted billing practices in the local legal community (Cleveland and the Northern District of Ohio). More specifically, the Commission determined--and the court's own independent review corroborated--that the applications suffered from the following serious deficiencies: (1) they lacked sufficient detail in their description of the legal services rendered to permit the court to evaluate fairly the measure of time devoted to the work performed; (2) Plaintiffs' counsel's practice of charging time in half-hour increments did not comport with the standard, widely-accepted practice of accounting for billable hours in either 10-or 6-minute intervals; (3) from one applicant to another, there were inconsistencies in the amount of time recorded for services that the several attorneys had performed together (e.g. group conference calls, attending hearings, etc.); (4) the applicants failed to furnish invoices or receipts for out-of-pocket expenses; (5) the applicants included charges for meals; (6) the hourly rates requested by the applicants did not properly reflect the usual and customary rates employed in the legal community of either Cleveland specifically or the Northern District of Ohio more generally; (7) the applicants' accumulation of unbilled time and untimely presentation of charges dating back more than 3-1/2 years was inconsistent with the practices in the Cleveland legal market (or any other major legal market, we might add); and finally (8) some of the fee applications lacked the appropriate certificates of service. On December 29, 1995, the district court advised Plaintiffs' counsel of the manifest defects in their applications and encouraged them to revise and resubmit them. In the meantime, Judge Krupansky granted Plaintiffs' counsel's Motion for an Interim Award of Fees and Costs, awarding them 33% of the amounts they requested. Even before the district court exercised its discretion to allow Plaintiffs' counsel to revise and resubmit their fee applications, however, these gentlemen knew something was amiss and that their applications, in light of the foregoing defects, could charitably be described only as insufficient in most every respect. Interestingly, on December 28, 1995, the day before the district court entered its Order adopting the Commission's findings, Plaintiffs' counsel petitioned the court to permit the withdrawal of their fee applications without prejudice. Noting the substantial amount of time and resources already devoted by both the court and the Commission, the court wisely held that to permit counsel to withdraw fee applications without prejudice at that late date and resubmit them in that form at some future time would be a waste of judicial resources, would serve no meaningful purpose, and would unnecessarily prolong the disposition of counsels' petition for a fee award.
 
 
 65
 On February 15, 1996, Plaintiffs' counsel resubmitted their fee applications. Their revised aggregate requests actually exceeded those in their initial application. Once again, the Legal Advisory Commission on Attorneys Fees, in its new report to the district court of April 12, 1996, determined that the revised applications suffered the same flaws as before and were still unreasonable and not in accordance with the generally accepted billing practices of the Cleveland legal market. Most importantly, the Commission found that the hourly compensation sought by Plaintiffs' counsel still far outstripped the acceptable rates for attorneys in the Cleveland legal community. The Commission opined that hourly rates ranging from $95 to $187 per hour--the amounts paid to the Defendants' attorneys in this action--are reasonable in the Northern District of Ohio.
 
 
 66
 As a threshold matter, Plaintiffs argue that once they filed a notice withdrawing their fee applications, filed pursuant to 42 U.S.C. § 1988, the district court no longer had jurisdiction over their fee applications because there was no longer an Article III case or controversy. This argument strains credulity. First, district courts have wide discretion to manage their own dockets and to decide issues which have consumed considerable resources, as in the instant matter. See Link v. Wabash R. Co., 370 U.S. 626, 630-31, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962). Second, the district court correctly noted that it had assumed jurisdiction and had invested a great deal of time and judicial energy to consider the applications; that counsel's already untimely fee requests would have an even greater negative impact on the financially distressed Cleveland School District if further delay were allowed; and that the court charitably had allowed Plaintiffs' counsel the opportunity to correct the deficiencies in and then resubmit their applications. Permitting counsel to withdraw their fee applications without prejudice at that advanced stage in the proceedings would have squandered valuable judicial resources and unnecessarily lengthened the disposition of counsel's petition for a fee award. Finally, we agree with Defendants' arguments that Plaintiffs'
 
 
 67
 attempt to withdraw their initial Fee Application on the eve of the Court's ruling was a shameless ploy, an endeavor to engage in legal gamesmanship, which was grounded in the false hope that they might resubmit their applications to a successor judge who might subject their applications to lesser scrutiny. It was a blatant attempt at forum shopping. Plainly, they ha[d] no intention of abandoning their request for attorneys fees, as evidenced by their proposal to withdraw their applications without prejudice to resubmission at a later date.
 
 
 68
 Defendants-Appellees' Br. 27.
 
 
 69
 The primary concern in an attorney fee case is that the fee awarded be reasonable. See Blum v. Stenson, 465 U.S. 886, 893, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984). A reasonable fee is "one that is 'adequate to attract competent counsel, but ... [does] not produce windfalls to attorneys.' " Id. at 897 (quoting S.Rep. No. 94-1022, 94th Cong., 2d Sess. 6 (1976)). Under the twelve-factor test enunciated by the Fifth Circuit in Johnson v. Georgia Highway Express, Inc., 488 F.2d 714 (5th Cir.1974), and adopted by the Supreme Court in Hensley v. Eckerhart, 461 U.S. 424, 432, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), a court must first determine the lodestar amount by multiplying the reasonable number of hours billed by a reasonable billing rate. That amount can then be adjusted based on the Johnson factors.[3] The Johnson court expressly noted that "courts must remember that they do not have a mandate ... to make the prevailing counsel rich." 488 F.2d at 719.
 
 
 70
 The party seeking attorneys fees bears the burden of documenting his entitlement to the award. See Webb v. County Bd. of Educ., 471 U.S. 234, 242, 105 S.Ct. 1923, 85 L.Ed.2d 233 (1985). The fee applicant "should submit evidence supporting the hours worked and rates claimed. Where the documentation of hours is inadequate, the district court may reduce the award accordingly." Hensley, 461 U.S. at 433. In its Order of April 26, 1996, the district court concurred with the comments of the Legal Advisory Commission on Attorneys Fees, noting that "a meaningful assessment of applicants' work effort is frustrated in this proceeding by the inadequate non-informative amended billing records that do not permit a reviewing court to identify distinct claims and the issues addressed, assess the necessity for multiple counsel, and distinguish between redundant, unnecessary, and duplicated work effort versus the proper utilization of time." Order of Apr. 26, 1996, at 12. Applying Johnson, the district court determined (1) that during the period for which attorneys fees were sought by Plaintiffs' counsel, "no novel or difficult issues confronted the applicants beyond the ordinary legal questions that routinely surface in an ongoing school desegregation case," id. at 20; (2) that "most, if not all, of the legal issues of first impression which initially attached to school desegregation litigation have been decided by Supreme Court dispositions a number of years ago and by various circuits throughout the nation," id. at 21; and (3) that Plaintiffs' counsel's day-to-day monitoring activities to ensure compliance with a decade-old desegregation order constituted "routine services which do not warrant enhanced hourly rates," id. at 22. Finally, the district court ruled that despite the fact they were afforded an opportunity to demonstrate compliance with generally accepted billing practices in the Greater Cleveland area by revising their fee applications and submitting additional evidence to the court, Plaintiffs' counsel had "individually failed to prove by a preponderance of evidence entitlement to the payment they seek." Id. at 30. Accordingly, the district court adopted the findings of the Commission and thus reduced the claimed hours of Mr. Atkins, Mr. Hardiman and Dr. Green by a factor of 20%, and the claimed hours of Mr. Whitaker by a factor of 50%. In determining a fair and reasonable hourly rate for each of the fee applicants, the court made special note of the hourly rates charged by other local and out-of-state attorneys in this action who addressed the same legal issues. Without exception, the hourly rates fell within the aforementioned range of $95 to $187. Judge Krupansky therefore approved the following hourly rates based on the recommendations of the independent Commission: $187 for Mr. Atkins (as opposed to the $340 he requested); $175 for Mr. Hardiman (as opposed to the $175-225 he requested); and $110 for Mr. Whitaker (as opposed to the $160 he requested). The district court's determination of reasonable attorneys fees in the instant matter falls squarely within this Court's precedent in Coulter v. State of Tennessee, 805 F.2d 146 (6th Cir.1986). In Coulter, we stated:
 
 
 71
 [Attorneys] fees are different from the prices charged to well-to-do clients by the most noted lawyers and renowned firms in a region. Under these statutes a renowned lawyer who customarily receives $250 an hour in a field in which competent and experienced lawyers in the region normally receive $85 an hour should be compensated at the lower rate. We therefore apply the principle that hourly rates should not exceed the market rates necessary to encourage competent lawyers to undertake the representation in question.
 
 
 72
 Id. at 149. See also Blum v. Stenson, 465 U.S. 886, 895, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984) ("[R]easonable fees under § 1988 are to be calculated according to the prevailing market rates in the relevant community."); Hadix v. Johnson, 65 F.3d 532, 535-36 (6th Cir.1995).
 
 
 73
 We reject Plaintiffs argument that the district court's determination of reasonable hourly fees disregards the law of this case. Prior to Judge Battisti's death and Judge Krupansky's assumption of the management of this case, Judge Battisti on seven occasions had previously considered and held reasonable both the hourly rate and billing methods that Judge Krupansky found unreasonable. Judge Battisti's Orders of January 29, 1992; April 23, 1992; July 23, 1993; and August 31, 1994, however, set forth absolutely no explanation whatsoever as to how the court determined the reasonableness of Plaintiffs' counsel's request. In two separate Orders dated September 21, 1990, Judge Battisti approved attorneys fees and expenses for Plaintiffs' counsel in the amounts of $265 an hour for Mr. Atkins, $175 for Mr. Hardiman, and $110 for Mr. Whitaker, noting merely that the services were "necessarily incurred" and that the amounts claimed were "reasonable." Order of Sept. 21, 1990. Finally, in his Order of April 10, 1991, Judge Battisti approved attorneys fees and expenses for Mr. Atkins and Mr. Hardiman at the hourly rates of $265 and $175, respectively. The Order provides that the court found "that the rates charged by Thomas I. Atkins and James L. Hardiman are reasonable and consistent with the prevailing market rates in this community...." Order of April 10, 1991. However, there was no evidence whatsoever to support this conclusory statement. Unlike Judge Krupansky's well-informed Order of April 26, 1996, Judge Battisti's unsupported conclusions were based neither on a proper Johnson analysis nor an independent review conducted by an ad hoc panel such as the Legal Advisory Commission on Attorneys Fees. Moreover, the conclusions clearly violated the clear standard that we announced in Coulter. Given the thorough nature of Judge Krupansky's analysis and the lack of similar inquiries on the part of Judge Battisti, this Court finds no basis upon which to find that the former abused his discretion in determining Plaintiff's counsel's attorneys fees.
 
 VI. CONCLUSION
 
 74
 For the foregoing reasons, we affirm the judgments of the district court in both appeals.
 
 DISSENT
 
 75
 COLE, Circuit Judge, dissenting.
 
 
 76
 It is easy to be seduced by the majority's superficial analysis of the issues involved in this case and lose sight of the fact that this case is not about inflexible quotas, busing, or local control of school boards. Rather, this case concerns the constitutional rights of black children who have been and continue to be denied the right to attend school in a unitary school system in which there are simply schools rather than "black" schools or "white" schools. The question before us is whether after more than thirty years of state-sanctioned racial isolation of black children in the Cleveland schools and more than twenty years of active resistance to the district court's orders requiring desegregation of those schools, the Cleveland Board of Education should be allowed to implement an assignment plan that will return Cleveland schools to a state of racial segregation. Because I believe the answer to that question is no, I respectfully dissent from the majority's opinion.
 
 I. BACKGROUND
 
 77
 My disagreement with the majority begins with a different understanding of the facts in this case. Although the majority attempts to paint a picture of a school desegregation process in which all parties harmoniously worked toward the goal of establishing a unitary school system, the record reveals a much more menacing history, one of resistance, defiance, and utter disregard for the district court's orders or, more importantly, for the rights of black children. Absent from the majority's narration is a description of the Cleveland Board of Education's refusal to halt its discriminatory practices and its undermining of the district court's attempts to dismantle Cleveland's unconstitutional dual school system.
 
 
 78
 Although the defendants' discriminatory policies, customs and practices pre-date the instant lawsuit by fifty years or more, the legal action that commenced this action began in 1973 with the filing of this lawsuit against the Cleveland Board of Education and various other defendants. On August 31, 1976, after a lengthy bench trial, Judge Frank J. Battisti found in a comprehensive 203-page opinion, that from 1940 to 1975 the Cleveland Board of Education and the Ohio State Board of Education engaged in a pattern of intentional and pervasive conduct for the express purpose of maintaining and perpetuating a dual school system, with certain schools designated for black students and others for whites. See Reed v. Rhodes, 422 F.Supp. 708, 796 (N.D.Ohio 1976). These defendants undertook and accomplished their segregative purpose in a variety of ways. For example, the district court found that the defendants used "relay classes"--the practice of teaching one group of students in the morning and another in the afternoon, such that those students received abbreviated and inferior instruction--and portable classrooms to ease overcrowding at majority black schools instead of transferring these students to neighboring majority white schools that had sufficient space. Reed, 422 F.Supp. at 782-83. Even when black students were transported to majority white schools for classes, the black students traveled as a group, including their instructor, and formed a single, separate unit at the receiving school. Every attempt was made, the court observed, to keep the transported black students isolated from the remainder of the student body. See id. at 783. In addition, the Cleveland Board of Education used devices such as special transfers for individual students and optional attendance zones to maintain segregated student bodies. See id. at 784. With respect to residential segregation, the court concluded that the Cleveland Board of Education contributed to residential segregation of the city by constructing schools to serve the segregated housing communities created by Cuyahoga Metropolitan Housing Authority ("CMHA"). See id. at 789-90. The combination of the Cleveland Board of Education's school construction program and CHMA's discriminatory housing policies resulted in schools that could be identified as "black" or "white" based on location and the race of the student population. See id.
 
 
 79
 As a result of the defendants' actions, the majority of children who attended public schools in Cleveland were educated in a segregated setting. See id. This intentional separation from their white counterparts led to further abuses of the rights of black children, which included the assignment of lesser qualified teachers to black schools and the assignment of black children to overcrowded, inadequate facilities. See id. at 782-92.
 
 
 80
 Following its finding of de jure segregation, the district court permanently enjoined the defendants "from discriminating on the basis of race in the operation of the public schools of the City of Cleveland, and from creating, promoting, or maintaining racial segregation in any school or other facility in the Cleveland Public Schools." See id. at 797. The district court then issued an order providing Instructions and Guidelines to assist the defendants in the development of a desegregation plan that would provide a comprehensive, system-wide remedy to eliminate the vestiges of the city's segregated school system. See JA at 625 (District Court Order: 12/7/76). After the appointment of a Special Master and two experts on school desegregation as well as the involvement of the Cleveland community, the district court issued a comprehensive Remedial Order on February 6, 1978, which required the defendants to desegregate Cleveland's school system, including the area of student assignments. See Reed v. Rhodes, 455 F.Supp. 569 (N.D.Ohio 1978). The defendants were required to bring the racial composition of each school into compliance with a maximum 15% deviation from the percentage of black students in the school system as a whole. See Reed v. Rhodes, 472 F.Supp. 615, 617 (N.D.Ohio 1979) (stating that "[a] fifteen percent deviation from the percent ratio of the district as a whole is the maximum deviation that would be reasonable"). In addition, the Remedial Order required that the defendants desegregate administrative, supervisory, and teaching personnel, all academic programs, and extracurricular activities. From the beginning, however, the Cleveland Board of Education actively resisted implementation of the Remedial Order.[1] For example, almost ten years after the district court's initial finding of de jure segregation in 1976, the defendants had yet to demonstrate any meaningful compliance with the district court's directives. As a result, in 1987, the district court approved an Unfinished Compliance Agenda, which set forth the fourteen components of its Remedial Order and stated in broad terms the systems and policies that would be established for each component. See JA at 773 (District Court Order: 8/14/87). In approving the Agenda, the district court stated:
 
 
 81
 [T]he court gives the [defendants] flexibility in shaping the systems and policies identified in the document. This willingness to give defendants flexibility must not be treated as an invitation to delay even further compliance with the Court's remedial orders.... The Unfinished Compliance Agenda is ample evidence of local defendant's failure to implement remedial orders over the past nine years.
 
 
 82
 Id. (emphasis added).
 
 
 83
 Five years later, the district court once again was compelled to state its dissatisfaction with the defendants' lack of compliance during the course of the litigation:
 
 
 84
 Despite judicial rulings, upheld on appeal, that the defendants engaged in clear and intentional racial segregation, for more than a decade they displayed recalcitrance and hostility toward the laws of the land and the remedial orders of this court that not only prevented progress in this case but also inflicted grievous wounds on the community as a whole. Of late, no one has been heard to assert that the schools are operated in a satisfactory manner.... Some would have preferred to continue denying black students educational opportunities. The time has passed when they were able to speak openly and they have learned to use code words. It is time though to stop using code words. It is time instead to commit ourselves to desegregated and improved schools for all of our students.
 
 
 85
 District Court Order: 4/2/92.
 
 
 86
 In 1992, the district court ordered the parties to commence negotiations to bring the case to a just and orderly resolution and to reach an agreement regarding the changes, if any, that would be implemented in the 1994-95 school year and beyond, as well as an agreement on financing those changes. The parties were encouraged to present the court with a settlement agreement by February 1, 1994.
 
 
 87
 Also at this time, the Cleveland Board of Education, proclaiming a newfound desire to improve educational opportunities for all children, filed a motion to adopt an alternate student assignment plan termed "Phase I," which exempted six elementary schools from the mandatory student assignment process set forth in the Remedial Order. The district court granted the motion on August 5, 1992. Because these six schools drew their students from some of the more racially integrated neighborhoods in Cleveland, the student bodies were naturally integrated. Encouraged by what they considered to be phenomenal results and tremendous community approval of Phase I, the Cleveland Board of Education developed a comprehensive plan popularly referred to as Vision 21[2] and filed a motion with the court for adoption of this plan. The Ohio State Board of Education filed objections to the adoption of Vision 21, citing the increased number of racially identifiable schools and the local defendants' indifference to that increase. In addition, the plaintiffs filed a memorandum citing their concerns regarding the adoption of Vision 21. Like the state defendants, plaintiffs' primary concern was the specter of racially identifiable schools. With the Cleveland Board of Education's assurance that the number of racially identifiable schools would not increase with parental choice and that integration would be maintained, the parties entered into an agreed order on July 21, 1993, to implement Vision 21, including its parental choice component, for the 1993-94 school year. That year, as few as forty-one and as many as forty-nine of one hundred twenty-seven schools fell outside the 15% racial parameter. All twenty of the schools that contained a disproportionately high percentage of black students were located on Cleveland's predominantly black East Side. Of the twenty-nine schools that had a disproportionately low percentage of black students, twenty-seven were located on Cleveland's predominantly white West Side.
 
 
 88
 Considering the explosion of racially identifiable schools under Vision 21's parental choice component, the plaintiffs continued to advocate retention of the Remedial Order's 15% requirement during negotiation of a settlement agreement. The parties ultimately entered into a Settlement Agreement on February 24, 1994, agreeing to maintain racially balanced schools in accordance with the 15% parameter until July 1, 2000. See JA at 986 (Settlement Agreement at pp. 2). The Settlement Agreement was converted to a Consent Decree on May 25, 1994.[3] See Reed v. Rhodes, 869 F.Supp. 1265 (N.D.Ohio 1994).[4]
 
 
 89
 Despite the language of the Consent Decree, on January 5, 1995, the local defendants filed motions for a declaration of unitary status as to student assignments and a dissolution of the 15% student assignment requirement.[5] Before this motion was ruled upon, however, the district court appointed Daniel J. McMullen as a special master to supervise discussions and facilitate an agreement between the parties regarding student assignments; unfortunately, the parties could not reach such an agreement.[6] Ultimately, on May 16, 1995, the parties entered into a Joint Stipulation, pursuant to which the defendants withdrew their motion for a declaration of partial unitary status. In addition, the Joint Stipulation provided that, for the 1995-96 school year only, student assignments would be based on defendants' proposed plan and that any increase in the number of schools exceeding the 15% requirement would not be deemed a violation of the Consent Decree. That year, fifty-eight schools--nearly one-half of the city's public schools--fell outside the 15% parameter. See JA at 1465 (Report of Superintendent Richard A. Boyd Evaluating the Results of Pupil Assignments for the 1995-96 School Year).
 
 
 90
 Pursuant to the Joint Stipulation, the parties were obligated to file a settlement agreement as to student assignments by December 31, 1995. The parties failed to do so because they were unable to reach an accord. On January 3, 1996, the defendants, moved for an order to modify the Consent Decree to eliminate the 15% requirement and for a declaration of unitary status as to student assignments. On May 8, 1996, the district court granted the motion.[7] The majority opinion affirms that order.
 
 II. DISCUSSION
 
 91
 Our analysis in this case, and indeed, in any school desegregation case starts with Brown, which enunciated the basic tenet that "in the field of public education the doctrine of separate-but-equal has no place." Brown v. Board of Educ.,(Brown I ) 347 U.S. 483, 495, 74 S.Ct. 686, 98 L.Ed. 873 (1954). However, crucial to the issues presented in this case are three cases decided a few years after Brown I, cases in which the Supreme Court expounded upon its holding in Brown I, and recognized that due to the force with which segregated school systems resisted the Court's decision in Brown I, its "all deliberate speed" directive was woefully inadequate. See Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958); Green v. New Kent County, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968); Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). Because any significant discussion of these cases is conspicuously absent from the majority opinion, a brief discussion of the bedrock principles set forth in this trilogy of cases warrants mention here. The following three cases, all of which are controlling Supreme Court precedent, are among those that guide my analysis.
 
 Cooper
 
 92
 In Cooper, the Supreme Court made clear that public opinion cannot divest lower courts of their duty to effectuate the Court's directives regarding school desegregation. Specifically, the Court explained as follows:
 
 
 93
 In short, the constitutional rights of children not to be discriminated against in school admission on grounds of race or color declared by this Court in the Brown case can neither be nullified openly and directly by state legislators or state executive or judicial officers, nor nullified indirectly by them through evasive schemes for segregation, whether attempted "ingeniously or ingenuously." Smith v. Texas, 311 U.S. 128, 132 [1940].
 
 
 94
 Cooper, 358 U.S. at 17. Thus, despite the majority's claim to the contrary, neither the public's so-called "support" of Vision 21, nor potentially adverse public reaction to the district court's decision, overrides the district court's obligation to ensure that the Supreme Court's directives are enforced.
 
 Green
 
 95
 In Green, the Supreme Court criticized so-called "freedom-of-choice" plans that did not promise to effectively eliminate segregation. The Court concluded that "[t]he burden on a school board today is to come forward with a plan that promises realistically to work, and promises realistically to work now. " Green, 391 U.S. at 439 (emphasis in original). In addition, the Court, unlike the majority in this case, recognized that "a plan that at this late date fails to provide meaningful assurance of prompt and effective disestablishment of a dual system is also intolerable." Id. at 438. Further, the Supreme Court noted that "[t]he obligation of the district courts, as it always has been, is to assess the effectiveness of a proposed plan in achieving desegregation. " Id. at 439 (emphasis added). Thus, it follows that "achieving desegregation," not yielding to public pressure or parental "choice," is the district court's primary obligation. The majority's decision not only allows the district court to cave in to such public pressure, but rewards the defendants for their dilatory and improper tactics. Indeed, here, the very reason that the case sub judice was still in the interim remedy phase was due to years of the defendants' refusals to comply with the district court's orders directing them to develop a plan that "promises realistically to work now."
 
 Swann
 
 96
 In Swann, the Supreme Court provided the following guidance on the very type of parental choice and school assignments at issue in this case. Significantly, the Court opined as follows:
 
 
 97
 Absent a constitutional violation there would be no basis for judicially ordering assignment of students on a racial basis. All things being equal, with no history of discrimination, it might well be desirable to assign pupils to schools nearest their homes. But all things are not equal in a system that has been deliberately constructed and maintained to enforce racial segregation. The remedy for such segregation may be administratively awkward, inconvenient, and even bizarre in some situations and may impose burdens on some; but all awkwardness and inconvenience cannot be avoided in the interim period when remedial adjustments are being made to eliminate the dual school systems.
 
 
 98
 Swann, 402 U.S. at 28. Further, the Court recognized what the majority fails to recognize here, that an assignment plan (or indeed a parental "choice" plan) is "not acceptable simply because it appears to be neutral." Id.
 
 
 99
 Given the degree of recalcitrance by the defendants, it is clear that the Supreme Court's mandates in Cooper, Green and Swann were consistently flouted. For the majority opinion to harp on the age of this case and to allow impatience to be the basis for violating the Supreme Court's clearly enunciated standards is suspect at best.
 
 A. Modification of the Consent Decree
 
 100
 The district court found, and the majority agrees, that the irreconcilable conflict between the 15% requirement and Vision 21's parental choice assignment plan, both adopted in the Settlement Agreement and Consent Decree, represented a significant changed circumstance and, therefore, modification of the Consent Decree was proper. I disagree. First and foremost, the defendants did not demonstrate that there were significant changed and unforeseen circumstances justifying such a modification. See Rufo v. Inmates of Suffolk County, 502 U.S. 367, 384-88, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992). Second, the proposed modification was not suitably tailored to the alleged changed circumstance. See id. at 391. As a result, the district court abused its discretion by modifying the Consent Decree when the legal standard for such a modification was not met.
 
 
 101
 As the majority explains, a party seeking modification of a consent decree must establish a significant change in the factual circumstances of the case that makes compliance with the consent decree substantially more onerous, shows a change in the law that renders the obligations placed upon the parties impermissible under federal law, or shows that the law has changed to make legal what the consent decree was designed to prevent. See id. at 384-88. Modification should not be granted, however, when a party relies upon events that actually were anticipated at the time it entered into such a decree. See id. at 386.
 
 
 102
 Here, any conflict between the 15% requirement and Vision 21's parental choice plan does not represent a significant change in circumstances justifying modification of the Consent Decree. The difficulty of balancing student populations in accordance with the 15% parameter while permitting parental choice was neither a new nor unforeseen circumstance. See id. at 385. Based on the implementation of parental choice during the 1993-94 school year, the parties were well aware that the application of parental choice significantly increased the number of schools that fell outside the 15% parameter; that year the number of schools not in compliance with the 15% requirement increased from between ten to fourteen to between forty-one to forty-nine out of one hundred and twenty-seven schools, depending on whose statistics one adopts. As Rufo advises, modification should not be granted when a party relies upon events that were actually anticipated at the time it entered into a consent decree. See id. at 386. Here, the defendants were certainly cognizant that parental choice would dramatically increase the number of racially identifiable schools. The plaintiffs, also anticipating this fact, refused to abandon the 15% parameter for precisely that reason. Because the difficulty of implementing both the parental choice plan and the 15% requirement was anticipated by the parties at the time of the negotiations that led to the Settlement Agreement and the Consent Decree, that difficulty cannot serve as a significant changed factual circumstance justifying modification.[8]
 
 
 103
 Another glaring defect in the district court's decision is its failure to engage in any meaningful analysis of whether the proposed modification, elimination of the 15% requirement, was suitably tailored to address the so-called "irreconcilable" conflict between the requirement and Vision 21's parental choice student assignment plan. Once the party requesting modification has met its initial burden of establishing an unforeseen, changed circumstance, a court must then determine whether the proposed modification is suitably tailored to the changed circumstance. See id. at 391. In evaluating the appropriateness of the modification, the court must take into account three concerns. First, a proposed modification must not create or perpetuate a constitutional violation. See id. Second, a proposed modification should not strive to rewrite a consent decree so that it conforms to the constitutional floor, meaning that if the consent decree provides for more protection than the Constitution requires, courts should not approve modifications that seek to conform only to the bare minimum the Constitution requires. See id. Finally, courts should not inquire whether any of the provisions could have been successfully opposed. See id. It is the first consideration that renders the proposed modification in this case inappropriate.
 
 
 104
 Modification of the subject Consent Decree clearly perpetuates racially identifiable schools. Segregated schools are the ends and means of a policy of de jure segregation. See Freeman, 503 U.S. at 474 (noting that racial exclusion was both the means and ends of a policy motivated by disparagement of, or hostility toward, the black race). Racially identifiable schools are one of the primary vestiges or effects of state-sanctioned segregation. See Oklahoma City Public Schools v. Dowell, 498 U.S. 237, 262, 111 S.Ct. 630, 112 L.Ed.2d 715 (1991) (Marshall, J., dissenting). Therefore, the struggle for equality of schools involves not only an assurance that students receive the same educational resources, but that they do so in a racially integrated environment rather than in a racially isolated one. See Brown I, 347 U.S. at 495 (holding that separate educational facilities are inherently unequal). Black children are not only entitled to non-discriminatory treatment in the future, they also must receive "what Brown II promised them: a school system in which all vestiges of enforced racial segregation have been eliminated." Wright v. Council of the City of Emporia, 407 U.S. 451, 463, 92 S.Ct. 2196, 33 L.Ed.2d 51 (1972). Accordingly, school districts are "clearly charged with the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch." Green, 391 U.S. at 437-38.
 
 
 105
 We need not speculate whether schools in Cleveland would become resegregated if the 15% requirement were eliminated and parental choice were adopted; there is ample evidence of that result. In 1995-96, when virtually unfettered parental choice was allowed, there were fifty-eight out of one hundred twenty-seven schools outside the 15% requirement. Therefore, elimination of the 15% requirement and the implementation of a "choice plan" that will lead to an increase in the number of racially identifiable schools, the primary vestige of a de jure school system, continues and perpetuates the unconstitutional condition of school segregation. See Rufo, 502 U.S. at 391.
 
 
 106
 Considering that the defendants have failed to demonstrate a significant changed circumstance justifying modification and that the proposed modification would perpetuate an unconstitutional condition, the district court's modification of the Consent Decree was improper. I therefore would reverse the district court's decision on this issue.
 
 B. Unitary Status
 
 107
 Similar to its decision to modify the Consent Decree, the district court's decision to declare unitary status and withdraw its supervision in the area of student assignments is unsupported by the record and the law. A school district, once segregated by law, is required to take all steps necessary to eliminate the vestiges or effects of de jure segregation. See Freeman v. Pitts, 503 U.S. 467, 485, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992). Thus, a school system seeking relief from a desegregation order has the burden of proving that it has complied in good faith with the desegregation order since it was entered and that the effects of state-sanctioned segregation have been eliminated to the extent practicable. See Dowell, 498 U.S. at 249-50. In Freeman, the Supreme Court cleared the way for district courts to relinquish control incrementally over certain aspects of a school's operation found to be in compliance with the desegregation order while maintaining supervision over other aspects that are not yet in compliance. See 503 U.S. at 489. Therefore, it is without question that a federal court in a school desegregation case has the discretion to order incremental or partial withdrawal of its supervision or control. See id. The question is the point at which such discretion may or can be exercised.
 
 
 108
 Freeman instructs that courts must consider three factors in determining whether such partial withdrawal of supervision is proper: 1) whether there has been full and satisfactory compliance with the decree in those aspects of the system in which supervision is to be withdrawn; 2) whether retention of judicial control is necessary or practicable to achieve compliance with the decree in other facets of the school system; and 3) whether the school district has demonstrated, to the parents of the children of the "once disfavored race" and to the public, its good faith commitment to the whole of the court's decree, and to those provisions of the law and the Constitution that were the predicates for judicial intervention in the first instance. See id. at 491. Two of these three factors fail to support the district court's withdrawal of judicial supervision over student assignments in Cleveland.
 
 1. Full and Satisfactory Compliance
 
 109
 A school district claiming full and satisfactory compliance in the area of student assignments must demonstrate that it has eliminated the effects of de jure segregation in the area of student assignments to the extent practicable. One vestige of de jure segregation in the area of student assignments is the existence of racially identifiable schools. When such schools exist, a school district must establish that the current racial imbalance was attributable to independent factors and not traceable to school board action. See id. at 494. Therefore, for the defendants to succeed in their motion for unitary status with respect to student assignments, they must establish that the Cleveland Board of Education has eliminated racial segregation to the extent practicable and that the existence of any racially identifiable schools is not traceable to its actions. See Columbus Bd. of Educ. v. Penick, 443 U.S. 449, 465 n. 13 (1979).
 
 
 110
 In Freeman, the Court, addressing this factor, agreed with the district court's finding that the Dekalb County School System had demonstrated full compliance in the area of student assignments because it had achieved desegregation to the extent practicable. Though there were racially identifiable schools in the district, the existence of those schools was not traceable to school board action. See 503 U.S. at 495. Rather, resegregation of the system was attributable to demographic changes that had taken place in Dekalb County over a twenty-year period. See id. at 494. Because the current resegregation in Dekalb County was the result of demographic shifts rather than school board policy, the school district was under no duty to remedy the resegregation. See id. at 495.
 
 
 111
 In this case, the defendants' claim that Freeman supports the declaration of partial unitary status because segregation had been eliminated to the extent practicable and that the increase in the number of one-race schools was attributable to demographic shifts and parents' individual choices rather than Cleveland Board of Education action. As evidence that the school district was desegregated and current racial imbalances were not traceable to school board action in any proximate way, the defendants point to a 1991 Office of School Monitoring and Community Relations (OSMCR)[9] Report stating that the Cleveland Board of Education had complied in large part with the district court's orders with respect to student assignments and that no evidence suggested that the Cleveland Board of Education was responsible for the racially identifiable schools existing at that time.[10] JA at 791.
 
 
 112
 For the sake of argument, even if the Cleveland schools were desegrated at the time of the OSMCR Report in 1991, the Supreme Court has made clear that unitary status in the area of student assignment cannot be hinged on the attainment of such status for a brief moment. See Freeman, 503 U.S. at 478. More important, regardless of whether the Cleveland school district was desegregated in 1991, the current racial imbalance existing in the district is traceable to Cleveland Board of Education action. The increase in the number of racially identifiable schools is the result of a school board plan permitting parents to choose segregated schools for their children to attend rather than adhering to the 15% requirement. This is distinguishable from the facts of Freeman, in which parents chose to move to a different part of the city so that their children could attend certain schools and, as a result of those residential choices, schools then became racially identifiable. In Cleveland, by contrast, the Cleveland Board of Education made it possible for schools to become racially identifiable by directly offering parents a segregated choice.[11] Against the background of former state sponsorship of one-race schools, any state-sponsored plan that allows for the persistence of racially identifiable schools perpetuates the message of racial inferiority associated with segregation. See Dowell, 498 U.S. at 261 (Marshall, J., dissenting). Because the choices exercised by the parents in Cleveland are done so in the context of a state-sponsored plan which offers a segregated schooling choice, it is indisputable that the increase in the number of racially identifiable schools since implementation of the parental choice plan is traceable to Cleveland Board of Education action.[12]
 
 
 113
 Neither the district court, nor the majority for that matter, addresses whether the allowance of parental choice pursuant to Vision 21 is tantamount to state action. Instead, both base their analyses on a comparison of the number of racially identifiable schools in the Dekalb County School System and the number of racially identifiable schools now existing in Cleveland. Because racially identifiable schools in Dekalb County significantly outnumber those existing in Cleveland, the majority reasons that because the Supreme Court found that Dekalb County was unitary, then surely Cleveland is as well. This reasoning ignores the fundamental analysis required by consideration of the three factors articulated in Freeman. Such an analysis should not be based on comparison of numbers with other districts, but on whether a specific district has been in full and satisfactory compliance with respect to student assignments and the school board's contribution to racially identifiable schools. Contrary to the district court's opinion, Freeman did not establish any benchmarks for allowable percentages of racially identifiable schools. Following this faulty reasoning to its logical conclusion, the issue of whether schools are unitary with respect to student assignments would be determined simply by comparing the number of racially identifiable schools in that district with those existing in Dekalb County. Such an analysis conflicts with more than forty years of school desegregation case law.
 
 
 114
 Furthermore, contrary to the defendants' assertions, there is no evidence in the record suggesting that the increase in racially identifiable schools is attributable to demographic factors. At the time the desegregation order was entered, the West Side of Cleveland was predominantly white and the East Side was predominantly black. That has not changed since this case was filed more than twenty years ago, a fact that the Cleveland Board of Education's senior officials have acknowledged. Since implementation of Vision 21's parental choice plan, Cleveland schools have experienced rapid segregation that mirrors the residential segregation of the city. Schools that are more than 90% black are located on the East Side of Cleveland, while schools that are predominantly white are located on the West Side. Although the defendants cite changing demographics as a basis for relinquishing supervision, they, as well as the majority and district court, fail to identify such changing demographic factors. Their failure to do so is understandable given that there were no significant changes in demographics, a fact readily acknowledged by the Cleveland Board of Education.
 
 
 115
 Had the majority engaged in an analysis of the current racial imbalance existing in Cleveland, it would have reached the inescapable conclusion that the increase in the number of racially identifiable schools is attributable to Cleveland Board of Education action. Unlike in Freeman, demographic changes did not play a role in the current racial imbalance existing in Cleveland public schools. Accordingly, the record does not support a finding that there has been full and satisfactory compliance with respect to student assignments. "It is a hollow remedy indeed where 'after supposed "desegregation" the schools remained segregated in fact.' " Milliken v. Bradley, 418 U.S. 717, 808, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974) (Marshall, J., dissenting).
 
 2. Good Faith
 
 116
 In addition, the defendants have not demonstrated good faith in complying with the district court's desegregation orders over time. See Dowell, 498 U.S. at 249-50. A history of good-faith compliance is evidence that current racial imbalances are not the product of de jure segregation and enables a court to better accept a school board's representation that it will not intentionally discriminate in the future. See Freeman, 503 U.S. at 498. When a school district has not demonstrated good faith under a comprehensive plan to remedy ongoing violations, courts have without hesitation approved comprehensive and continued district court supervision. See id. at 499 (citing Columbus Bd. of Educ. v. Penick, 443 U.S. 449, 461, 99 S.Ct. 2941, 61 L.Ed.2d 666 (1979)).
 
 
 117
 Throughout the period of judicial supervision, the Cleveland Board of Education has failed to demonstrate good faith in its compliance with the district court's orders for any reasonable length of time. The late Judge Battisti stated that the record amply demonstrated the Cleveland Board of Education's history of indifference, active resistance and defiance in advancing its Remedial Order. Judge Krupansky made a nearly identical observation in 1994 in commenting that the Cleveland Board of Education exhibited "a lack of good faith." Further, at one point, the district court sua sponte requested an investigation of Cleveland school officials because of their continued resistance. And, in 1992, the district court admonished the local defendants for their failure to comply with its orders.
 
 
 118
 Most telling, however, is the defendants' course of conduct with respect to the Consent Decree. As recounted supra, the defendants agreed to the Consent Decree and it was tentatively approved by Judge Battisti on March 18, 1994. Reed v. Rhodes, 869 F.Supp. 1265 (N.D.Ohio.1994). From the very beginning, however, defendants refused to abide by its terms. Dr. Ted Sanders, State Superintendent of Public Instruction, stated that the Cleveland Board of Education knew at the time it signed the Consent Decree that it was not altering its student assignment programs to comply with the decree, yet the Board failed to disclose this fact to either the plaintiffs or the state defendants. J.A. at 1404. The failure to disclose its true intentions, coupled with their long history of active resistance to Judge Battisti's orders, runs contrary to a finding of good faith.
 
 
 119
 Equally indicative of the defendants' bad faith with respect to the Consent Decree is that they sought to modify the decree by motion on January 5, 1995, just nine months after it was negotiated. Ostensibly, the defendants were concerned with the reassignment of some 400 students. Whatever problems the reassignment of those students presented were surely foreseeable nine months earlier when the Consent Decree was effectuated. Instead, the only material change in circumstances during the interim was that Judge Battisiti had passed away, and Judge Krupansky was assigned to the case on November 1, 1994. Two months later, the defendants filed their motion seeking relief from the Consent Decree. The plaintiffs contend that defendants viewed Judge Krupansky as more receptive to their position. Whether that is true or not is subject to debate; however, Judge Krupansky did ultimately grant the defendants' request.
 
 
 120
 I am thus convinced that any minimal good faith exhibited by the defendants is outweighed by years and years of resistance to desegregation. Accordingly, any finding of good faith was clearly erroneous. Indeed, it is entirely unclear to me what facts influenced Judge Krupansky to change his initial conclusion that the defendants demonstrated anything but bad faith in complying with the district court's remedial orders.
 
 
 121
 3. Supervision Required To Ensure Compliance In Other Areas
 
 
 122
 The district court concluded that continued supervision in the area of student assignments was not required to ensure compliance in other areas, such as faculty assignments and extracurricular activities. It does not appear that the district court clearly erred with regard to this factor. Thus, I accept that continued supervision over student assignments is not necessary to ensure compliance in other areas of the school system.
 
 
 123
 Nevertheless, the other two Freeman factors, full and satisfactory compliance in the area of student assignments and good faith, establish that the district court's withdrawal of its supervision was premature. The defendants plainly and simply have not demonstrated that they have eliminated segregation in that aspect of the school system to the extent practicable. Nor have they proven that the increase in racially identifiable schools was not caused by Cleveland Board of Education action. To the contrary, defendants' lack of good faith supports the inference that not only is the current resegregation attributable to their actions, but once they are not subject to judicial supervision, further resegregation is likely to occur. See Freeman, 503 U.S. at 499 ("A finding of good faith ... reduces the possibility that a school system's compliance with court orders is but a temporary constitutional ritual.") (quoting Morgan v. Nucci, 831 F.2d 313, 321(1st. Cir.1987)). There was simply no legal or factual basis for the district court to declare partial unitary status in this case.
 
 
 124
 Though it is not necessary to do so for purposes of analysis pursuant to Freeman, I would be remiss if I did not address what seems to be a paramount concern of the district court and the majority: the length of time of court supervision of the Cleveland school district. It is true that the Supreme Court never contemplated perpetual judicial oversight of former de jure segregated school districts. However, the Constitution requires that the job of school desegregation be fully completed and maintained so that the harm identified in Brown does not recur upon lifting the decree. The Cleveland Board of Education's history of unflagging defiance and its implementation of a plan that is rapidly returning the school district to a state of segregation suggests that lifting the decree is premature at this point. The Constitution has "imposed on school districts an unconditional duty to eliminate any condition that perpetuates the message of racial inferiority inherent in the policy of state-sponsored segregation." Dowell, 498 U.S. at 268 (Marshall, J., dissenting). Courts should be hesitant to terminate court supervision prior to fulfillment of this duty merely because litigation has gone on for a long time. The focus should not be on the length of the court's supervision, but on the factors and circumstances that make such lengthy supervision necessary. As Justice Blackmun noted: "[A]n integrated school system is no less desirable because it is difficult to achieve, and it is no less a constitutional imperative because that imperative has gone unmet for [decades]." Freeman, 503 U.S. at 518.
 
 
 125
 In Cleveland, this litigation has stretched nearly three decades not because of insuperable difficulties of implementing the commands of the Supreme Court and the Constitution, but because of the unpardonable recalcitrance of the defendants. This court should not affirm termination of supervision simply because the defendants have delayed compliance or because they claim, without offering proof, that they are not responsible for the increasing number of racially identifiable schools.
 
 
 126
 Desegregation is not an easy task. Nonetheless, neither the difficulty in achieving desegregation nor the length of time it takes can take precedence over the constitutional guarantee of equal justice. For all these reasons, I dissent from the majority's decision to affirm the district court's declaration of partial unitary status and its withdrawal of supervision over student assignments.
 
 C. Ex Parte Contacts
 
 127
 The plaintiffs filed a motion for recusal pursuant to 28 U.S.C. § 455(a), asserting that they "obviously and consistently" were excluded from numerous meetings and conferences "concerning financial, organizational, and academic issues which bear directly on contested remedial issues in this lawsuit." They claim that Judge Krupansky engaged in a succession of improper, disqualifying ex parte contacts with state defendants and officials, local defendants and staff, and private citizens. Judge Krupansky denied the motion.
 
 
 128
 The plaintiffs claim that Judge Krupansky abused his discretion in failing to recuse himself. They contend that the judge's numerous ex parte contacts evidence his bias, prejudice and partiality. In his Order denying the plaintiffs' recusal request, Judge Krupansky concedes that he had ex parte meetings in his chambers with Dr. Sanders, the State Superintendent of Public Instruction; his assistants, Dr. John Goff and Dr. Richard Boyd; and state defendants' counsel, Mark O'Neill. Judge Krupansky also acknowledges that he met, on six or seven occasions, with corporate executive representatives of civic organizations regarding the financial and management capabilities of the school system, including Robert Rawsen from the Cleveland Institute for Education. Judge Krupansky likewise recalls meetings and other contacts with the State of Ohio's Auditor, James Petro, and members of his staff. It also appears that Judge Krupansky had several contacts with Wanda Arnold, the City of Cleveland's general counsel.
 
 
 129
 In response to these allegations, Judge Krupansky asserts that the in-chambers meetings involved his oversight of the school system, which he had placed in state receivership and therefore were ministerial in nature. The judge also notes that he invited the plaintiffs' counsel to attend the meetings, not initially, but at a later date, and that the plaintiffs' counsel chose not to attend.
 
 
 130
 28 U.S.C. § 455(a) provides: "Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." Section 455(a) is designed "to promote public confidence in the judiciary by avoiding even the appearance of impropriety whenever possible." Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. 847, 865, 108 S.Ct. 2194, 100 L.Ed.2d 855 (1988) (emphasis added). Therefore, when the question of a judge's impartiality is a close one, the judge must recuse himself. See United States v. Dandy, 998 F.2d 1344, 1349 (6th Cir.1993).
 
 
 131
 This issue places me in the unenviable position of determining whether a colleague on this court, who volunteered to sit by designation as a district judge to hear this case upon Judge Battisti's death, abused his discretion in refusing to recuse himself. It really does not matter, for these purposes, that this was a racially polarized desegregation case; the only question is whether the record evidences bias or prejudice, or whether Judge Krupansky's impartiality might reasonably be questioned. Reluctantly, and with all due respect to my colleague, I find that Judge Krupansky should have recused himself given the clear and unequivocal appearance of partiality.
 
 
 132
 Although § 455(a) sets forth the statutory requirement for recusal, federal judges must also abide by a Code of Judicial Conduct for United States Judges, as adopted by the Judicial Conference of the United States. There are two canons of the Code that, in my view, would apply to Judge Krupansky's handling of this case. The first, Canon 3(A)(4), provides:
 
 
 133
 A judge should accord to every person who is legally interested in a proceeding, or the person's lawyer, full right to be heard according to law, and, except as authorized by law, neither initiate nor consider ex parte communications on the merits, or procedures affecting the merits, of a pending or impending proceeding. A judge may, however, obtain the advice of a disinterested expert on the law applicable to a proceeding before the judge if the judge gives notice to the parties of the person consulted and the substance of the advice, and affords the parties reasonable opportunity to respond. A judge may, with consent of the parties, confer separately with the parties and their counsel in an effort to mediate or settle pending matters. (emphasis added)
 
 The second Canon 3(C)(1)(a), reads:
 
 134
 A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances in which ... the judge has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding ... (emphasis added)
 
 
 135
 In this case, Judge Krupanksy does not deny holding meetings with state educational officials subsequent to the district court's order of March 3, 1995, directing the state to assume management of the Cleveland school district. JA at 1626-27 (District court order: 2/1/96 at pp. 14-15). According to Judge Krupansky, when legal counsel attended these meetings the discussions addressed "collateral state vs. local board jurisdictional conflicts ..." Judge Krupansky denies discussing "any substantive legal issues anchored in the mandates of [the] Court's various desegregation remedial orders and consent decrees, or those joined by the local board's motion of January 5, 1995 ..." Plaintiffs were neither informed of nor invited to these meetings.[13] Judge Krupansky stated that the meetings were purely ministerial, concerning the fiscal and administrative operations of the school district, and did not involve issues between the parties as adversaries in the pending litigation. See id. In addition, Judge Krupansky stated that he personally explained the nature of the meetings to plaintiffs' counsel, Mr. Hardiman and Mr. Atkins, once he received word in June 1995 that they had expressed concern about the nature of the meetings. See id. at 1630. Judge Krupansky also stated that he personally extended an invitation to both men to attend the meetings, but that over an eight-month period neither followed up on that invitation. See id.
 
 
 136
 It is without dispute, then, that Judge Krupansky (1) met repeatedly with defendants or their representatives; (2) conducted those meetings off the record; (3) failed to advise plaintiffs' counsel about the meetings prior to their occurrence; (4) advised plaintiffs' counsel about the meetings only after they had taken place and the issue had been aired by the newspapers; and (5) advised plaintiffs' counsel of some, but not all, of the meetings. It is also uncontroverted that a number of topics regarding the overall operation of the school district were discussed, including general management of the district, the district's position on a variety of related matters, and the status of pending attorneys' fees applications--which, in and of itself, is related directly to this case. Taken together, or viewed separately, these many ex parte contacts would lead any party in the position of the plaintiffs to question the fairness of the litigation. I simply do not see how any objective person could reach the contrary conclusion.
 
 
 137
 Looking first at the Canons, it is clear that they were each designed to afford parties their fair day in court. The cornerstone of fair judicial proceedings is a fair and impartial judicial officer. The Due Process Clause requires nothing less. As we have previously explained:
 
 
 138
 It is beyond dispute that "[a] fair trial in a fair tribunal is a basic requirement of due process. Fairness, of course, requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness." In re Murchison, 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955) ... (emphasis added)
 
 
 139
 * * *
 
 
 140
 In Marshall v. Jerrico, Inc., 446 U.S. 238, 100 S.Ct. 1610, 64 L.Ed.2d 182 (1980), the Supreme Court recognized that the "requirement of neutrality in adjudicative proceedings" serves dual interests of equal importance, as "it preserves both the appearance and reality of fairness, 'generating the feeling, so important to a popular government, that justice has been done,' by ensuring that no person will be deprived of his interests in the absence of a proceeding in which he may present his case with assurance that the arbiter is not predisposed to find against him." Id. at 252, 100 S.Ct. at 1618 (quoting Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 172, 71 S.Ct. 624, 649, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring)) (emphasis supplied). Thus, the neutrality requirement not only guarantees that each litigant receives a fair trial as determined by those learned in the law, but also engenders the faith in the integrity of this country's tribunals that is so unquestionably vital to this government's existence.
 
 
 141
 Anderson v. Sheppard, 856 F.2d 741, 745-46 (6th Cir.1988) (indenting and ellipses deleted; emphasis added). The judicial impartiality referenced in Anderson is of utmost importance, given that a judge must not only be impartial; he or she must, additionally, avoid all appearances of impartiality. See id. at 746.
 
 
 142
 In voting to affirm, the majority hinges their reasoning, in part, on plaintiffs' supposed failure to timely object to Judge Krupansky's ex parte conduct. This is impermissible burden-shifting. When a judge violates the Canons or section 455, the burden remains on the judge, at all times, to disqualify him or herself when appropriate--that burden never shifts to the parties. The majority also notes that Judge Krupansky invited the plaintiffs' counsel to attend the meetings, but the majority fails to mention that such invitation was extended after undetermined meetings had transpired.
 
 
 143
 Irrespective of Judge Krupansky's professed intent simply to oversee the school district's receivership case, the extent of the meetings and number of people attending unfortunately raised serious questions about the integrity of the judicial process in this case. As such, these plaintiffs and the public, on an objective basis, could reasonably question his impartiality. Accordingly, I would reverse the district court's denial of plaintiffs' motion for recusal and remand the case for reassignment to another judge.
 
 D. Attorneys' Fees and Costs
 
 144
 Because the court's disposition of the attorneys' fees issue occurred in the midst of the recusal dispute, I would vacate the district court's order and remand the issue for disposition by the judge to whom the case had been reassigned.
 
 III. CONCLUSION
 
 145
 For the foregoing reasons, I respectfully DISSENT from the majority's opinion.
 
 
 
 *
 The Honorable Nancy G. Edmunds, United States District Judge for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 In reviewing a trial judge's refusal to recuse himself, this Court applies an abuse of discretion standard. See In Re City of Detroit, 828 F.2d 1160, 1167 (6th Cir.1987)
 
 
 [2]
 District courts have discretion in determining the award of reasonable attorney fees under 42 U.S.C. § 1988. See Crabtree v. Collins, 900 F.2d 79, 82 (6th Cir.1990). In light of a "district court's superior understanding of the litigation and the desirability of avoiding frequent appellate review of what essentially are factual matters," an award of attorneys' fees under § 1988 is entitled to substantial deference. Hensley v. Eckerhart, 416 U.S. 424, 437 (1983). This Court thus reviews a district court's award of attorneys fees, including the fee rate, based on an abuse of discretion standard. See Scales v. J.C. Branford & Co., 925 F.2d 901, 909 (6th Cir.1991); Crabtree, 900 F.2d at 82
 
 
 [3]
 These factors are: (1) the time and labor required by a given case; (2) the novelty and difficulty of the questions presented; (3) the skill needed to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. See Johnson, 488 F.2d at 717-19
 
 
 [1]
 Following his assignment to preside over this case in 1994, Judge Krupansky stated:
 [A]s I go back over the history of the remedial order and the Court's involvement in this case, there are certain images that surface. And from the very beginning, there has been displayed not only indifference on the part of the School Board, but active resistance an [sic] defiance of an all good faith effort to advance the remedial order. ... As a matter of fact, it got so bad at one time that Judge Battisti sua sponte, as I recollect, initiated the Justice Department investigation, which ultimately ended up in a civil contempt citation. I recognize it was set aside for a lack of evidence, but it reflects a lack of cooperation, a lack of good faith in trying to advance the desegregation of schools....
 JA at 1323 (Transcript of Proceedings 2/24/95, pp. 23-24) (emphasis added).
 
 
 [2]
 In its original form, Vision 21 consisted of three major components: 1) Comprehensive Enhancements, which called for a strengthening of the educational foundation of Cleveland Public Schools; 2) Core Enhancements, which were designed to address the fundamental injustice of racial segregation through programs designed specifically to ensure African-American students a quality education as measured by improved student outcomes over a period of time; and 3) Parental Choice, which called for the expansion of the magnet school program and community model schools. Parents would have the choice to send their children to either a community model school or a district-wide magnet program. The defendants claimed that in cases in which the community model schools were racially identifiable, parents had the option of sending their children to a more integrated school. Of course, the local defendants assured the court in its motion that such racially identifiable schools under Vision 21 would be limited in number. Vision 21 was scheduled to be implemented over a four-year period
 
 
 [3]
 The Consent Decree provided:
 
 
 [5]
 1 Prior to the opening of school each fall, no school may have a student or faculty composition during the life of this Agreement which varies by more than ± 15 percentage points from the district-wide averages for elementary, middle and high schools
 
 
 [5]
 2 The sole exceptions to Section 5.1 are the variances existing during 1993-94 and agreed to for 1994-1995 and 1995-1996 school years, as provided in Section 6, and kindergarten classes and Lau sites, which shall be excluded from calculations
 
 
 [6]
 3 In the 1996-1997 school year and thereafter until July 1, 2000, all schools shall comply with the requirements of Section 5.1
 Realizing that it would be difficult, though not impossible, for the district to bring out-of-balance schools in compliance with the ± 15% parameter, the plaintiffs agreed to a flexible timetable to allow the defendants to racially balance those schools.
 
 
 [4]
 Six months after the entry of the Consent Decree, Judge Battisti passed away and Chief Judge Thomas D. Lambros assigned Senior Circuit Judge Robert B. Krupansky to preside over the case
 
 
 [5]
 The Consent Decree provided for the defendants to file a motion for declaration of unitary status on or after July 1, 1997. See Reed v. Rhodes. 869 F.Supp. 1265, 1273 (N.D.Ohio 1994)
 
 
 [6]
 Also at this time, the district court sua sponte directed the Ohio State Board of Education to assume supervisory, operational, financial, and personnel management of the Cleveland School District, which was on the verge of financial collapse
 
 
 [7]
 The case was transferred to Chief Judge George W. White on March 1, 1996; however, Judge Krupansky issued the May 8, 1996 order
 
 
 [8]
 The district court stated that modification was permissible because enforcement of the Consent Decree without modification would be detrimental to the public. Nonetheless, the initial burden requires that the party requesting modification demonstrate a significant change in circumstances. See Rufo, 502 U.S. at 384 (citing Duran v. Elrod, 760 F.2d 76, 759-61 (7th Cir.1985)). Thus, even if one could make the case that the Consent Decree is detrimental to the public, modification cannot be granted unless that detriment arises because of some significant change in either factual conditions or in the law. See Rufo, 502 U.S. at 384
 
 
 [9]
 The district court directed the establishment of the OSMCR for the purpose of desegregation administration
 
 
 [10]
 The majority repeatedly refers to a statement by Dr. Gordon Foster to the effect that the Cleveland school system is the most desegregated majority black school system in the country. Even if that were true, such a conclusion does not ipso facto mandate nor support a finding that the school system is unitary, considering the standard for that determination is based on facts specific to the district and not on comparison to other school districts. If Cleveland has not eliminated the vestiges of its prior de jure segregated system, then regardless of whether, in the opinion of one person, it is more desegregated than other districts, unitary status should not be declared
 
 
 [11]
 It is disingenuous for the defendants to argue that Vision 21's parental choice plan offers parents a number of choices in schools and that the predominantly black schools that now exist are the result of such choice. According to one parent of a black child in the Cleveland system, black parents do not have a true choice between sending their children to a one-race school or an integrated one. Rather, she testified, that parents' choices were constrained by the fact that certain programs were only offered at one-race schools. JA at 1817-18. In order for there to be true choice, she argued, children should have a choice between an integrated school and a one-race school offering the same programs. Id. As it stands now, children who wanted to choose a particular program often had to choose between that program and attending school in an integrated setting because the Cleveland school district did not offer both
 
 
 [12]
 The district court justified the increase in the number of racially identifiable schools by stating that a school district is not required to annually readjust attendance zones to keep up with demographics. This may be true, see Pasadena Bd. of Educ. v. Spangler, 427 U.S. 424, 436, 96 S.Ct. 2697, 49 L.Ed.2d 599 (1976), but the lack of an obligation to readjust attendance zones is premised on a demographic source of racial imbalance, not a state source. See id
 
 
 [13]
 The number and regularity of ex parte meetings or details regarding these meetings is not set out in the record, which only states that the meetings began subsequent to March 3, 1995. Because plaintiffs were not informed of the meetings until June 1995, the ex parte contacts took place for at least three months