Rachael **LESSARD**, et al., Plaintiffs,

v.

**CITY OF ALLEN PARK,**
**et al., Defendants.**

**Larry Page, et al., Plaintiffs,**

v.

**City of Inkster, et al., Defendants.**

**Nos. CIV.00–74306, 87–70992,**
**00–75626, 77–71100.**

United States District Court,
E.D. Michigan,
Southern Division.

March 11, 2003.

Peter W. Macuga, II, Steven D. Liddle, Macuga & Liddle, Detroit, MI, for Plaintiffs.

Kenneth A. Slusser, Johnson, Rosati, Farmington Hills, MI, R. Craig Hupp, Kurt M. Brauer, Bodman, Longley, Detroit, MI, Thomas A. Bengtson, Geoffrey H. Seidlein, Stacy L. Hissong, Hubbard, Fox, Lansing, MI, for Defendants.

## OPINION AND ORDER DENYING MOTION FOR RECUSAL

FEIKENS, District Judge.

### INTRODUCTION

Before me is a motion for recusal, brought under 28 U.S.C. § 455 by a number of plaintiffs represented by the firm of Macuga & Liddle, P.C. In that motion, plaintiffs' counsel claims that I have a bias in favor of defendants, that I have developed prior material knowledge of their cases through extrajudicial sources, and that I have engaged in unreported *ex parte* communications with defense counsel. Plaintiffs' motion is not brought under 28 U.S.C. § 144, which would require an affidavit.

For a full understanding of the background that actually occurred in which this motion is filed, I quote from my opinion and order holding that I have subject matter jurisdiction over the plaintiffs' cases. Opinion and Order Regarding Subject Matter Jurisdiction, Feikens J. (Feb. 25, 2003).

### BACKGROUND FACTS

Presently there are pending before me 34 putative class action cases, involving 13,000 claims of basement flooding alleging liability against individual Downriver Communities[1] and Wayne County. These cases were initially filed in the Wayne County Circuit Court.

Since 1977 I have had oversight responsibility as to water quality and pollution problems in the greater Detroit metropolitan area. That area consists principally of three major counties: Wayne, Oakland and

---

1. "Downriver Communities" include the following thirteen communities or entities, plus the following two drainage districts, all of which are defendants in the 1987 case (no. 87–70992): City of Allen Park, City of Belleville, Township of Brownstown, City of Dearborn Heights, City of Ecorse, City of Lincoln Park, City of River Rouge, City of Riverview, City of Romulus, City of Southgate, City of Taylor, Township of Van Buren, City of Wyandotte, Southgate–Wyandotte Relief Drainage District, and Ecorse Creek Pollution Abatement Drain.

Macomb. The City of Detroit, through its agency the Detroit Water and Sewerage Department (DWSD), furnishes water and removes wastewater from the residences and industries in this area, and the communities being served have over four-and-one-half million people.

In 1977 and in 1987, two major cases were brought by the United States Environmental Protection Agency (EPA) against both the Detroit Water and Sewerage Department and the communities it serves, and against Wayne County and the communities it serves through the Wyandotte Wastewater Treatment Plant. These cases were resolved in complex Consent Judgments which have, over time, been amended and over which I have jurisdiction.

In 1977, the EPA sued the State of Michigan and the City of Detroit in this court for violation of the Clean Water Act[2] (Case no. 77–71100) ("1977 Case"). Over the span of twenty-five years, this lawsuit resulted in three separate Consent Judgments (1977, 1980, and 2000) that are still closely monitored by me today. These Consent Judgments place enormous burdens on DWSD in a comprehensive effort to bring it into compliance with the Clean Water Act.

In 1987, the EPA and Michigan Department of Environmental Quality (MDEQ) also sued Wayne County and the Downriver Communities in this court, charging violations of federal and state water quality laws due to the failure of the Downriver Sewer System to comply with required water quality standards (Case no. 87–70992) ("1987 Case"). The parties to that litigation entered into a Consent Judgment (May 1994), and accepted constant monitoring by this court to ensure their compliance. This Consent Judgment placed heavy burdens upon Wayne County and the Downriver Communities. To date, $289,890,000 have been spent by them on improvements to the Downriver Sewage System.

I expressly retained jurisdiction in both Consent Judgments: "The court shall retain jurisdiction for the purpose of ruling on any motion by any party to enforce the terms and conditions of this Decree, under applicable law, until this Decree is terminated in accordance with Section XXIV ...." 1987 Case Consent Judgment Para. 66 at page 54. *See also* 1977 Case Second Amended Consent Judgment at 13.

On September 10–12, 2000, it was reported that a 100–year rainstorm overwhelmed the capacity of the Downriver Sewer System. The basements of approximately 13,000 homeowners were flooded in the Downriver Communities. The affected homeowners ("basement flooding plaintiffs") and, where applicable, their insurance companies sued their respective cities, Wayne County, or both for this flooding event in thirty-four proposed class action lawsuits in Wayne County Circuit Court, claiming that the improper operation of the sewer system by the defendants caused damage to their properties.

Wayne County removed all basement flooding cases from the Wayne County Circuit Court to this court, contending that the claims of the cities against it gave rise to federal subject matter jurisdiction under the 1987 Consent Judgment.

On October 25, 2000, Wayne County filed a motion for declaratory judgment in the 1987 case, based on the Consent Judgment resulting from that case, and asked this court to "declar[e] the rights, respon-

---

**2.** The Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.* (the Clean Water Act); the Michigan Water Resources Commission Act, Mich. Comp. Laws Ann. § 324.3101 *et seq.*; Part 31 of Michigan's National Resources and Environmental Protection Act; and the terms of National Pollution Discharge Elimination System Permit M10021156.

sibilities, liabilities and legal relationships between the parties in this action [ ] and the 1962 Contract as amended [ ] between Wayne County and Downriver Communities with regard to the Downriver Sewage Disposal System and with regard to sewer backups which have periodically caused basement flooding in the Downriver Communities." Mot. for Decl. J., Wayne County (citations omitted). Wayne County subsequently filed a similar motion for Declaratory Judgment in the 1977 case.[3] Wayne County's Motion For a Declaration of Rights with Regards to Inkster, Dearborn Heights and Allen Park (October 31, 2002).

One of the issues[4] raised by defendant Wayne County in that motion regarded the uncertainty of state law surrounding basement flooding cases in Michigan and asked that this court certify a question to the Michigan Supreme Court. Defendant Wayne County contended that the Governmental Tort Liability Act, MCLA § 691.1401, applied to it, and that it was immune from any liability for basement flooding. To address the motion filed by Wayne County for declaratory judgment, I sent notice to counsel for the parties to the Consent Judgment for a Rule 16 conference on October 27, 2000, which was held on November 20, 2000.

Even though several cases had been reassigned to me on November 6, 2000 by other judges in this court, the basement flooding plaintiffs were not joined to the 1987 case and Wayne County's declaratory judgment motion at that point, and I had no knowledge of these removals when the notice was sent out on October 27, 2000.

Since it began to appear that the plaintiffs in the basement flooding cases which were in the process of being removed to this court and reassigned to me as companion cases, they had to be heard on the question whether or not to certify a question to the Michigan Supreme Court regarding the status of Michigan Law, I specifically ordered that a transcript be made to preserve the record. At the conference, I explained that "[t]his matter is on the record [s]ince it will effect [sic], undoubtedly, parties *that are not yet in this case and with parties who will be in other cases.*" Tr. for Nov. 20, 2000 Hrg. at 3 (emphasis added). A copy of that hearing transcript is attached hereto as Exhibit A and was received by plaintiffs' counsel.

That conference took up the issue whether or not a certified question should be submitted to the Michigan Supreme Court. During the conference it became evident that, in the cases that were in the process of being filed in the Wayne County Circuit Court by basement flooding plaintiffs against defendant municipalities, those defendant municipalities had also filed third-party complaints against defendant Wayne County.

Consequently, I sent out a notice on December 14, 2000, a copy of which is attached hereto and marked Exhibit B. That notice was mailed to all counsel of record, including counsel for plaintiffs in the basement flooding cases that were in

---

**3.** It was discovered that some plaintiffs resided in areas not governed by the 1994 Consent Judgment, but resided in areas governed by the Consent Judgment in a different case, *United States, et al. v. City of Detroit, et al.* (Case No. 77–71100).

**4.** Another issue raised in the motion by Wayne County was that the City of Dearborn Heights, one of the Downriver Communities,

was a participant in the Michigan Municipal Risk Management Association (MMRMA), and that Association has filed a subrogation lawsuit against Wayne County because of a rain event that *took place on February 17–18, 1998.* This case in no way involved any of the plaintiffs or their counsel, who bring this motion for recusal in cases arising out of the September 10–12, 2000 rainstorm.

the process of being removed to this court. The notice indicated that the central issue that would be raised in the conference would be the question of certifying an issue of law to the Michigan Supreme Court as to the liability of municipalities for flooded basements stemming from a significant rainfall in September 10–12, 2000 in the Downriver area.

This conference was held on December 20, 2000. So that there can be a complete understanding that there was no *ex parte* conference of any kind, I attach hereto the entire transcript of the conference of December 20, 2000, marked as Exhibit C.

The Michigan Supreme Court tentatively accepted the certified question on May 15, 2001 and asked all parties, including the basement flooding plaintiffs, to file briefs. A year later, on May 21, 2002, the Michigan Supreme Court declined to rule on the question.

> By order of May 15, 2001, the question certified by the United States District Court for the Eastern District of Michigan was held in abeyance pending the decision in *Pohutski v. City of Allen Park* (Docket No. 116949) and *Jones v. City of Farmington Hills* (Docket No. 117935). On order of the Court, the decision having been issued on April 2, 2002, 465 Mich. 675, 641 N.W.2d 219 (2002), the certified question is again considered and, the subject of such certified question having been addressed in such decision, the Court respectfully declines the request to answer it.

In re Certified Question by the U.S. District Court for the Eastern District of Michigan, No. 118387, Order (Mich. May 21, 2002).

Following the Michigan Supreme Court's denial of the certified question, I held a hearing on July 15, 2002, in which I distributed a memorandum of law raising questions I had regarding the interpretation of the Michigan Supreme Court's decision in *Pohutski* and *Jones* and their application to the basement flooding cases before me. In my memorandum, I also proposed joining the basement flooding plaintiffs to the 1987 case.

Because the basement flooding plaintiffs were indispensable parties to Wayne County's declaratory judgment motion and in order to protect the basement flooding plaintiffs' due process rights, I ordered them joined to the 1987 case and Consent Judgment under Rule 19 of the Federal Rules of Civil Procedure over plaintiffs' counsels' protest. *See* Amended Order As to Joinder of Parties, No. 87–70992 (October 16, 2002).[5]

On February 25, 2003, I held that I had jurisdiction over the basement flooding claims under two alternative theories for jurisdiction: (1) the basement flooding plaintiffs' trespass/nuisance claim includes the element of "causation or control" which requires the interpretation of the federal Consent Judgments; and (2) I have original jurisdiction over Wayne County's declaratory judgment motion, and I exercise pendent party jurisdiction over the basement flooding plaintiffs because they arise from a common nucleus of operative facts. *See* Opinion and Order Regarding Subject Matter Jurisdiction, Feikens J. (Feb. 25, 2003).

*ANALYSIS*

 Plaintiffs pinpoint specific remarks and holdings to discredit my impartiality in this case. However, these remarks and holdings cannot be viewed in a vacuum. When these events are viewed in context

---

5. When it was submitted that some basement flooding plaintiffs resided in areas governed under the 1977 case Consent Judgments, I ordered those basement flooding plaintiffs joined to the 1977 case. *See* Order as to Joinder of Parties, No. 77–71100 (November 12, 2002).

as prescribed by § 455(a), the heart of this recusal motion comes into focus: plaintiffs disagree with this court's legal conclusion that the claims of these basement flooding plaintiffs directly implicate the Consent Judgments in the 1977 and 1987 cases.[6]

Indeed, that legal conclusion was the central holding in my joinder orders (Amended Order as to Joinder of Parties, No. 87–70992 (October 16, 2002); Order as to Joinder of Parties, No. 77–71100 (Nov. 12, 2002)) and Jurisdiction opinion (Opinion and Order Regarding Subject Matter Jurisdiction, No. 00–74306 (February 25, 2003)). The heart of this recusal motion lies in plaintiffs' counsel unwillingness to accept these legal conclusions.

## A. *Legal Standard*

It is clear that the goal of 28 U.S.C. § 455 is to promote public confidence in the judicial system by avoiding even the appearance of partiality. *Easley v. University of Michigan Board of Regents*, 853 F.2d 1351, 1355 (6th Cir.1988). Under § 455(a),[7] the question is whether "a reasonable person with knowledge of *all the facts* would conclude that the judge's impartiality might reasonably be questioned." *Wheeler v. Southland Corp.*, 875 F.2d 1246, 1251 (6th Cir.1989) (emphasis added). "This standard is *objective* and is not based on the subjective view of a party." *Wheeler*, 875 F.2d at 1251. Moreover, disqualification under 455(b)(1)[8] "must be predicated upon extrajudicial

conduct rather than on judicial conduct, and upon a personal bias as distinguished from a judicial one, arising out of the judge's background and association and not from the judge's view of the law." *Green v. Nevers*, 111 F.3d 1295, 1303–04 (6th Cir.1997). As the movants, plaintiffs have the burden of demonstrating a basis for disqualification through objective evidence of personal bias. See *Rhodes v. McDannel*, 945 F.2d 117, 120 (6th Cir. 1991).

## B. *Ex parte communications*

With these premises in mind, and with a reading of the transcripts referred to as Exhibits A and C, it is clear that no *ex parte* conferences were held regarding the issues in these cases.

The November 20, 2000 Rule 16 conference was scheduled as a result of Wayne County's declaratory judgment motion against the Downriver Communities in the 1987 case. When the notice of the conference was sent out on October 27, 2000, the basement flooding cases were not yet on my docket. Moreover, basement flooding plaintiffs were not parties to the 1987 case and the declaratory judgment action at that time. Thus, the Rule 16 conference cannot be said to be *ex parte*.

Nevertheless, I took great care to protect the basement flooding plaintiffs' rights. I ordered a full transcript of the conference be made because "[basement

---

6. Plaintiffs assert that "[a]lthough as isolated events this Court's conduct may appear harmless, an overall review raises, at the very minimum, reasonable questions over the Court's impartiality. Therefore is it important to start at the beginning." Pl. Br. at 5. I agree. However, plaintiffs' "beginning" only goes as far back as 1998. In order to understand the complex details of this case, the "beginning" dates back to 1977, when the EPA first filed suit against the City of Detroit.

7. Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned. 28 U.S.C. § 455(a).

8. (b) He shall also disqualify himself in the following circumstances:
 (1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceedings;
 28 U.S.C. § 455(b)(1)

flooding plaintiffs] will be effected [sic] by what we do here. So they have got to know about this. And that's why this record is being made." Tr. of November 20, 2000 Conf. at 5.

On December 14, 2000, I wrote a letter to all plaintiff counsels in the basement flooding cases that had been removed to my court, inviting them to participate in a hearing to discuss whether I should certify a question to the Michigan Supreme Court.

Wayne County and the Downriver Communities were of the strong opinion that the uncertainty in Michigan law as to governmental immunity had to be addressed. The transcript of the December 20, 2000 conference developed fully the positions of the parties with regard to the filing of a certified question. The transcript shows that plaintiffs' counsels were fully heard on the issue.

I certified the question to the Michigan Supreme Court because, in the uncertainty that I saw that existed in Michigan law, I preferred to have that question answered by the Michigan Supreme Court rather than to predict what I thought the Court would do if it took up the issue.

Moreover, in monitoring the Consent Judgments, I have had numerous communications with counsels for Wayne County and the Downriver Communities for various and sundry matters arising out of the Consent Judgments. *Reed v. Rhodes,* 179 F.3d 453 (6th Cir.1999) is instructive here. In *Reed,* Judge Krupansky of the Northern District of Ohio oversaw a remedial Consent Decree for 25 years to desegregate the Cleveland Public Schools. The Consent Decree controlled the district's pupil assignment strategies, and the zoning and busing of students to achieve racial balance. *Id.* at 456. In 1996, after 23 years of overseeing the Consent Decree, Judge Krupansky entered a termination order ending federal court control of the school district. In challenging the termi-

nation order, plaintiffs moved for Judge Krupansky's removal, arguing that he had made various *ex parte* communications with defendants that required his recusal. The United States Court of Appeals for the Sixth Circuit disagreed. It noted that

[w]hile the school system remained in state receivership, the district court was necessarily involved in the oversight of the State's work. In this capacity, the court necessarily had to communicate with Dr. Sanders, Dr. Goff, and others, as Judge Krupansky made clear in his Order of February 1, 1996. Much of this communication occurred ex parte.... Finally, Judge Krupansky's communications with the State Superintendent, the Superintendent of Schools in Cleveland, the Auditor of the State, with representatives of McKinsey & Co., and with counsel for the state and local defendants were related exclusively to the judicial oversight of the reorganization which the court had mandated in its Order of March 3, 1995. None of these matters involved any issue which was then or later in dispute with the plaintiffs. (citations omitted)

Thus, the Sixth Circuit concluded that Judge Kruspansky's communications, though *ex parte,* arose "in a purely judicial context" and "were ministerial in nature[,] not pertain[ing] to matters at issue between the parties as adversaries." *See also United States v. Yonkers Bd. of Ed.,* 946 F.2d 180, 184 (2d Cir.1991) (in the judge's role of monitoring a court consent decree, "no appearance of impartiality was created by excluding the City from discussions about the Turnkey Contract, to which the City was not a party").

Many of the same factors are present here. I have overseen these complex Consent Judgments for over 25 years, and my duties in overseeing those Consent Judgments extend beyond the scope of these

basement flooding cases. Discussions concerning the certified question focused upon Wayne County's motion for declaratory judgment, which did not include the basement flooding plaintiffs at the time. The basement flooding cases cannot be seen in a vacuum, they must be analyzed in the greater context of my supervision of the federal Consent Judgments.

Plaintiffs cite *United States v. Craven*, 239 F.3d 91 (1st Cir.2001), and *Edgar v. K.L.*, 93 F.3d 256 (7th Cir.1996), instances where the court of appeals disqualified the trial judge because the trial judge conducted off-the-record, *ex parte* briefing with expert witnesses. However, these cases are illustrative in how they are distinguishable from this case: the sessions in those cases were off-the-record, but the November 20, 2000 hearing was recorded. Moreover, I afforded plaintiffs' counsels a chance to be heard on the certified question matter at a subsequent hearing even though they were not yet part of the 1987 case.

Furthermore, I ordered basement flooding plaintiffs joined to the '77 and '87 cases specifically to protect their due process rights in the resolution of the declaratory judgment motion. In my orders of joinder, I held that:

> [s]ince the declaratory judgment seeks to declare the cities' and Wayne County's rights and responsibilities for basement floodings under the [1987 Case] Consent Judgment, the absence of the basement flooding plaintiffs in the declaratory judgment action would deprive basement flooding plaintiffs of their due process rights to protect their interest in the litigation. *See Intercept Sec. Corp. v.Code–Alarm, Inc.*, 164 F.R.D. 215, 218 (E.D.Mich.1995) ("to impair or impede interest under Rule 19(a)(2)(i),

final decree must leave controversy in such condition that its final determination is inconsistent with equity and good conscience."). Therefore, they are necessary parties under Fed.R.Civ.P. 19(a)(2)(i).

Amended Order As to Joinder of Parties at 5 (October 16, 2002). At the time, plaintiffs' counsel vigorously protested against the joinder orders. *See* Plaintiffs' Response to Wayne County's Memorandum Re Joinder with *United States v. Wayne County* (October 16, 2002). See also Motion to Dismiss from 1987 EPA Case for Lack of Subject Matter Jurisdiction, No. 00–74306 (November 27, 2002).

Suffice it to say that, when the Michigan Supreme Court indicated that it would take up the question, all parties were invited by that Court to file briefs. It is also understandable that the basement flooding plaintiffs, the municipal defendants, and the County of Wayne were disappointed by the Court's conclusion as to the issue of governmental immunity. Plaintiffs' counsel were disappointed by the result because, while the Court's finding of governmental immunity was applied only prospectively, it requires the plaintiffs to prove the elements of condition, causation and control. The defendants likewise were disappointed because, while the Court held that immunity applied to governmental agencies engaged in governmental functions, it did not apply this immunity to the defendants, and held that the change in the law would only be applied prospectively.

Truly, since an unfavorable legal ruling cannot be the basis of a recusal, *a fortiori*, neither can a ruling to certify a question to the State Supreme Court, where I deferred the question.[9]

---

9. In hindsight, there can be no doubt that a vacuum in Michigan law existed since the Michigan Supreme Court reversed a 14 year old decision in *Hadfield v. Oakland County Drain Comm'r*, 430 Mich. 139, 145, 422 N.W.2d 205 (1988).

C. *Extrajudicial sources*

In *Liteky v. United States,* 510 U.S. 540, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994), the United States Supreme Court instructed that under § 455(a), with several exceptions, only "extrajudicial sources" can constitute a basis for recusal. The Court held that

> [f]irst, judicial rulings alone almost never constitute a valid basis for a bias or partiality motion. In and of themselves (i.e., apart from surrounding comments or accompanying opinion), they cannot possibly show reliance upon an extrajudicial source; and can only in the rarest circumstances evidence the degree of favoritism or antagonism required ... when no extrajudicial source is involved.... Second, opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deepseated favoritism or antagonism that would make fair judgment impossible. *Id.* at 555, 114 S.Ct. 1147 (citations omitted).

Plaintiffs contend that I have a personal bias against them stemming from "extrajudicial sources." Indeed, they seem to lump all background facts that I gained through 25 years of monitoring these Consent Judgments as derived from "extrajudicial sources." The federal statutes which mandate comprehensive water standards that daily affect the health and safety of more than four-and-a-half million people in this region through Consent Judgments over which I have oversight have imposed significant judicial responsibility.

To carry out that task fairly and competently required me to gain extensive knowledge in water and waste water systems.

That knowledge, where it is discredited in a recusal motion as extrajudicial knowledge, and therefore is disqualifying, must mean that a judge possessing that knowledge is marginalized and cannot be other than biased.

In *Town of Norfolk v. U.S. Army Corps of Engineers,* 968 F.2d 1438 (1st Cir.1992), the United States Court of Appeals for the First Circuit faced a similar situation. Judge Mazzone of the District Court for the District of Massachusetts had overseen an elaborate remedial order to clean up the Boston Bay Harbor in compliance with the Clean Water Act for many years. The remedial order called for the construction of a six billion dollar sewage treatment system for the metropolitan Boston area, monthly compliance reports by the Massachusetts Water Resources Authority (MWRA), and massive dredging projects to clean up the damage to the Harbor. After many frustrating years of trying to select a landfill site, the MWRA filed a motion to recuse Judge Mazzone on the basis of several statements made by Judge Mazzone expressing his frustration with the Commonwealth of Massachusetts and its slowness. The First Circuit affirmed Judge Mazzone's refusal to recuse himself, noting that the historical context of Judge Mazzone's long oversight of the Boston Bay Harbor project was "significant," and that any scrutiny of his comments must be taken in the context of which the comments were made. *Id.* at 1460–61.

Similarly, in this case, my oversight of the Consent Judgments during the years in which I have been so involved has given me knowledge of the complexities in the problems affecting water quality and pollution. That knowledge has enabled me to carefully protect and analyze the rights of the parties before me and are not proper grounds for recusal. My comments and rulings must be seen under this greater

context. Plaintiffs' contention that this knowledge as deriving from an "extrajudicial source" must be rejected.

To accept plaintiffs' contentions that these are "extrajudicial sources," one must first accept the premise that these basement flooding cases stand in a vacuum. However, I have repeatedly rejected that legal conclusion in my joinder orders and order finding jurisdiction. Thus, the heart of this recusal motion is a legal disagreement and is not a proper grounds for recusal.

*CONCLUSION*

For the foregoing reasons, plaintiffs' motion for recusal is hereby DENIED.

IT IS SO ORDERED.